UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO.: 4:25-cr-687 |
| **BENLIN YUAN** and **FANYUE GONG**, a/k/a "**TOM**" | |

### GOVERNMENT'S MOTION FOR TRANSFER OF CASE AS RELATED

COMES NOW the United States of America, by and through Nicholas J. Ganjei, United States Attorney for the Southern District of Texas, and the undersigned Assistant United States Attorneys, and respectfully requests this Honorable Court to transfer the above-captioned case to the Honorable Lee H. Rosenthal, who presides over the related case of *United States v. Hao Global LLC, et al.*, 4:25-cr-510 (S.D.Tex.). In support thereof, the Government offers the following:

### I. PROCEDURAL HISTORY

On May 7, 2025, Alan Hao Hsu was arrested in Houston, Texas, for smuggling export-controlled Nvidia Graphic Processing Units ("GPUs") out of the United States in violation of U.S. law. On October 10, 2025, Hsu and his company, Hao Global LLC, each pleaded guilty to one count of Smuggling Goods from the United States, Aiding and Abetting, and one count of Unlawful Export Activities, Aiding and Abetting. That case, 4:25-cr-510, was assigned to the Honorable Lee H. Rosenthal.

On November 28, 2025, and December 2, 2025, Benlin Yuan and Fanyue Gong were also charged, respectively, by Criminal Complaint with smuggling export-controlled GPUs out of the United States in violation of U.S. law. (D.E. 1). The Criminal Complaints—attached hereto as Exhibits A and B—alleged that Yuan and Gong were members of the same enterprise and scheme

to which Hsu pleaded guilty.  In both Complaints, Hsu was referred to as "Houston Resident-1" and Hao Global LLC was referred to as "Houston Company-1."  Yuan was arrested on November 28, 2025; Gong was arrested on December 3, 2025.  When the Honorable Lindsey R. Vaala, United States Magistrate Judge, Eastern District of Virginia, ordered Yuan to be released with conditions on December 3, 2025, the Government filed a Motion for Stay and Revocation of Release Order. (D.E. 4). That motion was assigned to and decided by the Honorable Lee H. Rosenthal. (D.E. 5).

On December 17, 2025, a federal grand jury seated in Houston, Texas, returned an Indictment charging Benlin Yuan and Fanyue Gong with Conspiracy to Violate the Export Control Reform Act, in violation of 50 U.S.C. § 4819; and Smuggling Goods from the United States, Aiding and Abetting, in violation of 18 U.S.C. §§ 554 and 2. (D.E. 16).

That same day, the Government also filed a Notice of Related Case, stating that the above-captioned matter is related to case number 4:25-cr-510, *United States v. Hao Global LLC, et al*., currently pending before the Honorable Lee H. Rosenthal, Judge of United States District Court, Southern District of Texas. (D.E. 21). Because the present case and case number 4:25-cr-510 deal with significantly overlapping facts and similar legal and factual issues, the Government respectfully requests the case be transferred to Judge Rosenthal in the interest of judicial economy.

## II. ANALYSIS

Because the present Indictment and the charges currently before Judge Rosenthal in case number 4:25-cr-510 deal with the same facts, the same scheme, and the same charges, transfer is prudent. On October 10, 2025, the defendants in case number 4:25-cr-510 pleaded guilty to a Criminal Information with charges of Smuggling Goods from the United States, Aiding and Abetting, in violation of 18 U.S.C. §§ 554 and 2; and Unlawful Export Activities, Aiding and Abetting, in violation of 13 U.S.C. § 305 and 18 U.S.C. § 2. The Criminal Information—attached

hereto as Exhibit C—alleges Hsu and other individuals, utilizing Hao Global LLC, knowingly exported and attempted to export at least $160 million worth of export-controlled Nvidia H100 and H200 Tensor Core GPUs outside the United States in violation of U.S. law.  Hsu's plea agreement—attached hereto as Exhibit D—further details the activities of the scheme, including Hsu's funding of his purchases from the same company described as "Hong Kong Logistics Company" in Yuan's and Gong's Criminal Complaints.  Indeed, much of Hsu's criminal activity serves as the introduction portion of both Complaints and features many of the same entities.

The present Indictment centers on the roles of Yuan and Gong in the scheme to export GPUs with "Hong Kong Logistics Company" and other co-conspirators. Likewise, the charges in case number 4:25-cr-510 also deal in large part with the same criminal scheme, as detailed in the Plea Agreement.  Ultimately, both Yuan and Gong are charged with their involvement in the same enterprise that Hsu pleaded guilty to in case number 4:25-cr-510. The fact that the present case concerns the same enterprise, parties, and activities at issue in case number 4:25-cr-510 weighs in favor of assignment to a single judge given the significant factual overlap. Moreover, under 18 U.S.C. § 3553(a)(6), the court must consider "the need the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." By having a single district court judge preside over defendants who have participated in the same series of acts or transactions, which constitute the underlying offense, the Court is best situated to prevent such disparities.

Because many of the facts in the present case and case number 4:25-cr-510 before Judge Rosenthal are identical, transfer to Judge Rosenthal is warranted as she is presently assigned the first-filed of these related cases. Requiring multiple district court judges to handle the same set of complex facts will unnecessarily duplicate judicial efforts.

### III. CONCLUSION

WHEREFORE, based on the foregoing, the United States respectfully requests that this

Honorable Court transfer the above-captioned case to the Honorable Lee H. Rosenthal.

NICHOLAS J. GANJEI
United States Attorney
Southern District of Texas

By      *S. Mark McIntyre*

S. Mark McIntyre
Robert S. Johnson
John Marck
Assistant United States Attorneys

### CERTIFICATE OF CONSULTATION

The undersigned hereby certifies that the Government consulted with the attorneys for defendants about this motion: Jeffrey Vaden, attorney for Alan Hao Hsu and Hao Global LLC is unopposed; Samuel Louis, attorney for Benlin Yuan, is opposed; Tristan LeGrande, attorney for Fanyue Gong, has no objection to transferring the case.

*S. Mark McIntyre*

S. Mark McIntyre
Assistant United States Attorney

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on December 24, 2025, to the CM-ECF system of the United States District Court for the Southern District of Texas for electronic delivery to all counsel of record.

*S. Mark McIntyre*

S. Mark McIntyre
Assistant United States Attorney

4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO.: 4:25-cr-687 |
| **BENLIN YUAN** and **FANYUE GONG**, a/k/a "**TOM**" | |

## <u>ORDER GRANTING MOTION FOR TRANSFER OF CASE AS RELATED</u>

It is hereby ORDERED that the Government's Motion for Transfer of Case as Related in the above-entitled and numbered criminal case is hereby GRANTED and the case is hereby TRANSFERRED to the Honorable Lee H. Rosenthal.

DONE at Houston, Texas, this _____ day of December 2025.

_____
HONORABLE KENNETH M. HOYT
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

AO 91 (Rev. 11/11)  Criminal Complaint

## UNITED STATES DISTRICT COURT
for the
Southern District of Texas

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED
**November 28, 2025**
Nathan Ochsner, Clerk of Court

United States of America
v.
Benlin YUAN

_____
*Defendant(s)*

)
)
)
)
)
)
)

Case No.

4:25-mj-712

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___November 1, 2023, to present,___ in the county of ___Fort Bend___ in the
___Southern___ District of ___Texas___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. §§ 4819 (a)(1), (a)(1)(A), (a)(2)(D), and (b); and | Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations |
| 15 C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1 | |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

*Tyler Fox*
_____
*Complainant's signature*

Tyler S. Fox, Special Agent, U.S. Dept. of Commerce
_____
*Printed name and title*

Attested to by the complainant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___November 28, 2025___

*Richard W Bennett*
_____
*Judge's signature*

City and state: ___Houston, Texas___

Hon. Richard W. Bennett, U.S. Magistrate Judge
_____
*Printed name and title*

Sealed

Public and unofficial staff access
to this instrument are
prohibited by court order

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

### "ATTACHMENT A"

### INTRODUCTION

I, Tyler Fox, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

I am a Special Agent with the United States Department of Commerce, Bureau of Industry and Security ("BIS"). I have been so employed since July 2024, and I am currently assigned to the Office of Export Enforcement's Forward Assigned Post – San Antonio, Texas. Prior to my employment with BIS, from 2020 until July 2024, I was a Special Agent with the U.S. Drug Enforcement Administration, St. Louis Division, where I participated in criminal investigations of drug trafficking and money laundering. As a BIS Special Agent, I am charged with investigating the unlawful export of goods and commodities controlled for export by the Department of Commerce, including firearms and technology, for reasons of national security and/or foreign policy. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations into alleged violations of federal law. Since joining BIS and the Office of Export Enforcement, I have investigated, among other things, violations of the Export Control Reform Act, 50 U.S.C. §§ 4801-4852 and the smuggling of goods from the United States, in violation of 18 U.S.C. § 554.

This affidavit is made in support of a criminal complaint against Benlin Yuan for Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations in violation of 50 U.S.C. §§ 4819 (a)(1), (a)(2)(A), (a)(2)(D), and (b); and 15 C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1.

I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. The facts in this affidavit come from my personal

1

observations, my training and experience, and information obtained from other agents, witnesses, and agencies, including the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI").  This affidavit is intended to show merely that there is sufficient probable cause for the requested Criminal Complaint.  It does not set forth all my knowledge, or the knowledge of others, about this matter.

## LEGAL BACKGROUND

1.  **Export Control Reform Act (ECRA) and Export Administration Regulations (EAR)**

1.      The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items . . . be controlled." 50 U.S.C. § 4811(2).  To that end, ECRA grants the President the authority to control, among other activities, "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons."  *Id*. at § 4812(b).  ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id*. at § 4813(a).

2.      Pursuant to ECRA, the Department of Commerce reviews and controls the export of certain items, including commodities, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774.  In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  The EAR impose licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or re-exported lawfully from one foreign destination to another.

3.     The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1.  Items on the CCL are categorized by an Export Control Classification Number ("ECCN") based on their technical characteristics.  Each ECCN has export control requirements depending on the destination, end user, and end use.

4.     The EAR establish the responsibility of the Department of Commerce, Bureau of Industry and Security ("BIS") to approve or deny export license applications with the input of other federal agencies.  If a license is required for a transaction subject to the EAR and the transaction does not qualify for a specific license exception, a U.S. person must submit a license application to BIS and receive a license prior to engaging in the transaction.  The license may be subject to certain terms and conditions defined by BIS or other federal agencies.

5.     Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter, including any of the unlawful acts described in paragraph (2)."  Such unlawful acts include, among others, that: "[n]o person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by [ECRA and the EAR], or any order, license or authorization issued thereunder," including the unlicensed export or reexport of an item subject to the EAR and on the CCL.  *See* 50 U.S.C. § 4819(a)(2)(A), 15 C.F.R. § 736.2(b)(1).

**2. Advanced Computing/Supercomputing Interim Final Rule (AC/S IFR)**

6.     Beginning on October 7, 2022, BIS began amending the EAR to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items, including certain Nvidia-manufactured Graphic Processing Units ("GPUs"), through an interim final rule (effective on October 7, 2022).

3

*See* 15 C.F.R. § 744.23; 87 Fed. Reg. 62186 (Oct. 7, 2022).  The purpose of the rule is "to protect U.S. national security and foreign policy interests by restricting the [People's Republic of China's] access to advanced computing for its military modernization, including nuclear weapons development, facilitation of advanced intelligence collection and analysis, and for surveillance." BIS further imposed additional export controls on certain advanced computing semiconductor chips (chips, advanced computing chips, integrated circuits, or ICs), transactions for supercomputer end-uses, and transactions involving certain entities on the Entity List.  These restrictions applied to high-performance ICs that are useful in data center processing and artificial intelligence, with a total processing performance of 4800 or more, or a total processing performance of 1600 or more and a performance density of 5.92 or more.  These controls and restrictions applied to the People's Republic of China ("PRC"), including Hong Kong and Macau.

7.      On October 25, 2023, BIS released an interim final rule (effective on November 17, 2023) that expanded the export controls related to advanced computing and semiconductors, including with respect to additional Nvidia-manufactured GPUs, which had been developed specifically for the PRC following the October 7, 2022 restrictions.  According to the interim final rule, "[t]hese revisions protect U.S. national security interests by further restricting China's ability to obtain critical technologies to modernize its military capabilities in ways that threaten the national security interests of the United States and its allies."  88 Fed. Reg. 73458 (Oct. 25, 2023).

**3. Export Controls on Relevant GPUs, Baseboards, and Servers**

8.      There are several Nvidia products described below that the defendant and his co-conspirators conspired to unlawfully export and smuggle outside the United States, all of which were subject to export controls and required a license from BIS for export to the PRC, including Hong Kong, at all times relevant to this Affidavit.

9. The following items are classified under ECCN 4A090.a: Nvidia H100 GPUs; Nvidia H200 GPUs; Nvidia H200 GPU baseboards; Nvidia HGX A100 8-GPUs; and Nvidia HGX A100 640 GB GPU baseboards. Items classified under ECCN 4A090.a are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

10. The following item is classified under ECCN 3A090.a: Nvidia A100 GPU 80GB SXM4. Items classified under ECCN 3A090.a are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

11. The following items are classified under ECCN 5A002.z: SuperMicro SuperServers 420GP-TNAR/420GP-TNAR+ and SuperMicro A+ servers configured with A100 baseboards. Items classified under ECCN 5A002.z are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

**4. Smuggling**

12. Pursuant to Title 18, United States Code, Section 554, it is unlawful to fraudulently or knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

**5. Unlawful Export Information Activities**

13. Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the

5

export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

14.     The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. EEI also is required, regardless of the value of the goods, if the goods require an export license. 15 C.F.R. §§ 758.1 and 30.2.

15.     Title 13, United States Code, Section 305, makes it a federal crime to knowingly fail to file or to knowingly submit false or misleading export information through the SED, EEI, or the AES, or to otherwise use the SED or the AES to further any illegal activity.

## DEFENDANT AND RELEVANT PARTIES

16.      The defendant, Benlin Yuan, is the President of an information technology company in Virginia ("IT Company") that provides data center services, IT support and cloud consulting services in North America. IT Company is a subsidiary of a Beijing, China-based information technology Company ("PRC IT Company") that provides services for computing equipment.

17.     Co-conspirator-1 is an employee of a Shenzhen, China-based technology company that is a supplier of AI equipment and provides services related to import and export declarations ("Shenzhen Technology Company"). Co-conspirator-1 is also connected to a Hong Kong-based shipping and logistics company ("Hong Kong Logistics Company") that is affiliated with Shenzhen Technology Company. For example, certain public financial records describe Hong Kong Logistics Company as part of the corporate network of Shenzhen Technology Company.

6

Certain other co-conspirators described below are connected to Shenzhen Technology Company and/or Hong Kong Logistics Company.

18.    Co-conspirator-2 and Co-conspirator-3 are high-level employees of PRC IT Company.  Co-conspirator-2 also appears to be a director of IT Company.  Cooperating Witness-1 ("CW-1") is an employee of IT Company.[1]

19.    Co-conspirator-4 and Co-conspirator-5 appear to be based in the PRC and affiliated with Hong Kong Logistics Company and/or Shenzhen Technology Company.

## SUMMARY OF PROBABLE CAUSE

20.    BIS, HSI, and the Federal Bureau of Investigation ("FBI") are investigating a sophisticated illicit procurement conspiracy and smuggling network that is orchestrating the purchase and unlicensed export of controlled Nvidia A100, H100, and H200 Tensor Core GPUs and HGX baseboards, which are used for artificial intelligence ("AI") applications and high-performance computing ("HPC"), to the PRC, including Hong Kong, and other destinations, in violation of U.S. export laws.  Specifically, a GPU is an electronic circuit that can perform calculations at high speed, key to processing the vast amounts of data used to train AI applications. A tensor core is a specialized processing unit within a GPU that is designed to accelerate matrix operations, which are used in AI, deep learning, and HPC tasks.  A GPU baseboard is a server platform that integrates multiple high-performance GPUs.  A GPU server is a kind of server that has additional GPUs in addition to standard Central Processing Units (CPUs) – a CPU is the primary component of a computer that is key to running a computer's operating system and

---

[1] CW-1 was approached by law enforcement and agreed to provide information. CW-1 is lawfully present in the United States and is seeking permanent residency status. CW-1 has no criminal history and is not providing information to law enforcement for any monetary gain or judicial consideration.

applications. These technologies are dual-use, i.e. they are used for both civilian and military applications.

21.    From at least in or about November 2023, Hong Kong Logistics Company and its co-conspirators have engaged in a conspiracy to unlawfully export Nvidia technologies from the United States to the PRC. From at least on or about May 21, 2025, defendant Benlin Yuan joined the conspiracy. Yuan, along with known and unknown co-conspirators, knowingly and willfully conspired to export from the United States to the PRC, including Hong Kong, controlled Nvidia GPUs and baseboards, without first obtaining the required licenses or authorizations from the United States Department of Commerce in violation of ECRA, 50 U.S.C. §§ 4819 (a)(1), (a)(1)(A), (a)(2)(D), and (b); and 15 C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1.

22.    As part of the overall scheme, employees of Hong Kong Logistics Company and Shenzhen Technology Company conspired with the defendant and others inside and outside the United States to violate U.S. export controls by obtaining export-controlled Nvidia GPUs through straw purchasers and intermediaries, including in the Southern District of Texas, and falsely indicating that the goods were for U.S. customers or customers in third countries such as Taiwan or Thailand, which would not require a license from BIS. The GPUs were shipped to multiple U.S. warehouses, where individuals removed Nvidia labels and relabeled the GPUs with labels bearing the name "SANDKYAN" – believed to be a fake company – and then prepared the goods for export. The shipping and export paperwork, submitted in AES, also misclassified the goods as "adapters," "adapter modules," or "contactor controllers." The co-conspirators then shipped the goods or attempted to do so, directly or indirectly, to the PRC and Hong Kong in violation of export laws.

23.     As further described below, on or about May 10, 2025, agents investigating this scheme received information regarding pallets of Nvidia GPUs being stored in a U.S. logistics company's ("U.S. Logistics Company") leased New Jersey warehouse ("New Jersey Warehouse") that were destined for the PRC.  When agents visited the New Jersey Warehouse two days later, including an undercover agent ("UC-1"), they observed individuals relabeling the Nvidia GPUs with labels for the fake company (SANDKYAN).  As further detailed below, BIS subsequently detained the GPUs and moved them to another government-controlled facility.  The government-controlled warehouse received numerous calls about the missing GPUs from unknown individuals.

24.     Because of the delayed shipment, the intended recipient of the goods believed the GPUs had been stolen by UC-1.  After UC-1 was put into contact with Co-conspirator-4, Co-conspirator-4 ultimately offered a $1 million payment to release the goods.  However, Co-conspirator-4 required that the GPUs be inspected prior to payment.  Yuan and co-conspirators from Hong Kong Logistics Company and PRC IT Company arranged for six "inspectors" approximately two weeks later.  At least four of the six inspectors were employees of IT Company.

25.     After BIS detained the GPUs from the New Jersey Warehouse and moved them to another location, BIS sent a detention notice to an individual who represented himself as a lawyer representing the owner of the GPUs and other equipment.  Co-conspirators from Hong Kong Logistics Company, PRC IT Company and Yuan then developed detailed plans with false information to present to BIS as a compliance back-story to attempt to secure the release of the GPUs and other items that had been detained.  Additionally, for an entirely separate batch of Nvidia GPUs, IT Company's office and storage space was used to store and eventually ship those GPUs outside of the United States on behalf of the Hong Kong Logistics Company.

26.     The defendant Benlin Yuan directed multiple aspects of the GPU smuggling scheme.  <u>First</u>, Yuan helped organize IT Company's employees to inspect the mislabeled GPUs prior to the $1 million payment along with Co-conspirator-1, who was acting on behalf of Hong Kong Logistics Company, which was the ultimate customer for certain GPUs. Co-conspirator-1 directed Yuan to ensure that the inspectors did not say that the goods were destined for the PRC, and Yuan agreed.  <u>Second</u>, Yuan directed discussions regarding the story the company would use to respond to BIS to get the GPUs and other detained equipment released. Yuan engaged in several conversations about providing false information to U.S. authorities regarding the ultimate customer of the goods.  <u>Third</u>, Yuan participated in and directed actions involving IT Company's handling of the storage of _another_ shipment of Nvidia GPUs and eventual export, on behalf of Hong Kong Logistics Company.  When Co-conspirator 5 from Shenzhen Technology Company directed CW-1 to remove Nvidia labels from the GPUs and replace them with fake labels, Yuan directed that CW-1 should not put on the fake labels as that could cause problems.[2]  According to CW-1, Yuan was concerned that the labels would be suspicious. Ultimately, CW-1 removed the Nvidia labels but did not affix fake labels.

27.     Neither Yuan, IT Company, PRC IT Company, Hong Kong Logistics Company, Shenzhen Technology Company, or their known co-conspirators had a license from BIS or a pending license application to export to China any of the export-controlled Nvidia GPUs, baseboards or other servers described in this Affidavit.

### STATEMENT OF PROBABLE CAUSE

**1.  Houston Company-1 Purchased Export-Controlled GPUs on Behalf of Hong Kong Logistics Company, Which Were Transported and Stored by Same U.S. Logistics**

---

[2] All communications described in this Complaint occurred in Mandarin, unless otherwise noted, and the communications referenced here are certified translations.

**Company as the GPUs Inspected by IT Company Employees on Behalf of Hong Kong Logistics Company**

28.     From October 2024 to May 2025, ("Houston Resident-1"), utilizing his company, Houston Company-1, knowingly purchased and smuggled export-controlled Nvidia H100 and H200 GPUs out of the United States.  Those GPUs were ultimately exported to the PRC and Hong Kong.

29.     Specifically, Houston Company-1 purchased at least $60 million worth of GPUs from a U.S. global technology company ("U.S. Global Technology Company").  Houston Company-1 received funds from various entities to facilitate the purchases, including companies based in the PRC.  Houston Company-1 received at least $1.5 million directly from Hong Kong Logistics Company and received other funds indirectly – for example, using front companies – from PRC companies.  Shipping records show that GPUs purchased from U.S. Global Technology Company by Houston Resident-1 were ultimately exported to the PRC, including by transshipping the GPUs through Singapore and Malaysia, without the required licenses from the Department of Commerce.

30.     On March 14, 2025, Houston Company-1 scheduled GPUs for pickup at U.S. Global Technology Company's distribution center.  The GPUs were then shipped to U.S. Logistics Company's warehouse in New York.[3]  Shipping records confirmed the GPUs arrived at that warehouse on March 15, 2025.  During an interview of U.S. Logistics Company's representative ("U.S. Logistics Company Representative") in May 2025, agents learned that the GPUs arrived at the warehouse at the request of a PRC-based logistics company ("PRC Logistics Company").

---

[3] U.S. Logistics Company then began leasing another warehouse in New Jersey because of a pricing dispute which is later described in the Affidavit.

31.     According to the U.S. Logistics Company Representative, the U.S. Logistics Company handled the receiving, warehousing, palletizing, and shipping of domestic freights for PRC Logistics Company.  The orders typically included only the number of pallets, weight, and dimensions of the goods to be shipped; the orders did not include a description of the contents, which would typically be included as part of paperwork in the normal course.

32.     According to the U.S. Logistics Company Representative, whenever a shipment arrived at U.S. Logistics Company's warehouse, the PRC Logistics Company would arrange for "engineers" to visit the warehouse for testing and inspection of the goods.  The U.S. Logistics Company Representative had, on at least one occasion, been present during the engineers' testing and inspection of a shipment and observed that the contents of the shipments were all marked "Nvidia."   Photographs taken by U.S. Logistics Company Representative during the testing/inspection, and provided to agents, show a box of opened Nvidia products, which agents believed to be export-controlled Nvidia GPU baseboards.  Additional photographs show the engineers working on at least four pallets of items, all of which appear to be Nvidia HGX baseboards.

33.     Once testing and inspection were completed, the engineers repackaged the products, and U.S. Logistics Company arranged for the packages to be re-palletized before they were shipped via truck to a New York shipping company's ("New York Shipping Company") leased warehouse space in New York ("New York Warehouse"), as requested by the PRC Logistics Company.  Every shipment that U.S. Logistics Company handled for the PRC Logistics Company was routed to go to the same New York Shipping Company's New York Warehouse.

34.     All known communication between the PRC Logistics Company and the engineers was in Mandarin and done via an encrypted messaging application.  Agents identified three of the

12

engineers based on photographs and identifiers provided by the PRC Logistics Company to U.S. Logistics Company. One of the engineers was identified as having unlawfully entered the United States from Mexico, at a time and place not designated by immigration officials, near McAllen, Texas, in the Southern District of Texas ("Engineer-1").[4]

35.     During an interview of the U.S. Logistics Company Representative on May 10, 2025, agents learned that 14 pallets that were due to be sent to New York Shipping Company were being stored at the U.S. Logistics Company's New Jersey warehouse ("New Jersey Warehouse"). An additional 26 pallets were on the way to the New Jersey Warehouse. Per communications from the PRC Logistics Company, the engineers planned to test and inspect all goods contained in the pallets before the U.S. Logistics Company shipped the pallets to the New York Warehouse. Specifically, two engineers were scheduled to inspect the pallets on May 12, 2025.

### 2. BIS Detained Mislabeled GPUs and UC Operation Led to Negotiation of Inspection by IT Company Employees and $1 Million Payment to Release Goods

#### a. Agents Observed Mislabeled Nvidia GPUs with Fake Company Labels and Shipping Records Showing False Information

36.     On May 12, 2025, UC-1 went to U.S. Logistics Company's New Jersey Warehouse for approximately one hour. During that time, UC-1 observed two engineers, both appearing of Chinese origin, unboxing and inspecting open boxes of Nvidia GPU baseboards. UC-1 spoke in Mandarin with Engineer-1. During the conversation, UC-1 inquired about what Engineer-1 and his colleague were working on. Engineer-1 stated they were working to change the labels of the products, and that they needed to cover all the original Nvidia product labels. When UC-1 asked Engineer-1 why they needed to change the labels, Engineer-1 responded that it was for "export

---

[4] On May 29, 2025, Engineer-1 was arrested in New York for Improper Entry by Alien in the Southern District of Texas. Engineer-1 provided a post-*Miranda* statement to law enforcement. Additionally, on July 25, 2025, agents interviewed Engineer-1 with his attorney present.

purposes." When UC-1 asked further about the export issues, Engineer-1 replied that they probably should not discuss those problems.

37.     During his time in the New Jersey Warehouse, UC-1 observed both engineers removing Nvidia labels from the GPUs and replacing them with other labels with the name "SANDKYAN." The engineers carried pages of preprinted labels, including new barcodes and "SANDKYAN" product labels. The engineers placed these adhesive labels over existing Nvidia product codes.

38.     Open-source searches of "SANDKYAN" did not reveal any results indicating such a brand or company bearing that name exists; thus, there is reason to believe that "SANDKYAN" is a fabricated brand used to obfuscate the fact that the GPUs – which were subject to U.S. export controls – were in fact Nvidia GPUs.

39.     On May 13, 2025, UC-1 and another BIS agent returned to the New Jersey Warehouse. The agents observed the pallets the engineers had inspected during the previous day – all of which now contained "SANDKYAN" labels – and the newly delivered pallets. The anti-tampering tape on the boxes was taped over, and several new adhesive labels were placed on the outside, falsely describing the products as "Adapter Group." The new labels also listed the origin of the product as "Made in Taiwan," with new product numbers, carton ID, serial numbers, and QR codes. Agents also observed additional product labels with descriptions of "Adapter Group," fictitious model numbers, and stickers bearing the "SANDKYAN" brand name.

40.     Based on my training and experience, hiding the origin and type of the goods using false information is a common tactic to evade export controls by avoiding potential inspections when goods are shipped outside the United States.

41.     The newly delivered pallets also included servers that contained Nvidia HGX A100 GPU baseboards.  Except for one invoice and two bills of lading, there was otherwise no physical paperwork in the warehouse showing where the products came from.  The invoice, which was recovered from a single pallet, showed an Australian company as the purchaser of 100 Nvidia H200 GPUs from a U.S. supplier and Australia as the ultimate destination.  Both bills of lading, which were recovered from discarded packaging materials, showed a Massachusetts company that is a retailer of Nvidia GPUs in Southborough, Massachusetts ("Massachusetts Company-1") as seller, with shipment to the New Jersey Warehouse.

42.     To prevent the illegal export of these goods, agents detained and removed all the GPUs from the warehouse.  In total, the agents recovered more than $30 million worth of export-controlled GPUs and other items from the New Jersey Warehouse.

43.     In May 2025, agents also conducted a query for the New York Shipping Company in CBP's AES regarding past export records and activity.  Agents learned that the New York Shipping Company began filing EEI with commodity descriptions including "adapter group," "adapter module," and "adapter board," in March 2025.  These filings continued from March 12, 2025 through at least May 13, 2025.  The shipments were filed "no license required" with an ultimate destination of an air freight facility near the Toronto International Airport in Canada.  The ECCN field for all these export filings was left blank.  Based on my training and experience, I know that leaving the ECCN field blank is a tactic used to conceal the true nature of the shipment and is an indication that the products may be diverted to other countries contrary to U.S. law and export controls.

44.     On May 16, 2025, agents spoke with employees of the New York Shipping Company at its offices.  The employees informed agents that they recently had several exports to

Canada.  The contents of the exports were described as "adapters," and the shipments were directed by an individual based in Hong Kong.  A review of EEI filings for the Canada exports listed a company with a Colorado address ("Colorado Company-1") as the U.S. Principal Party of Interest ("USPPI") with an individual listed as the company agent.  The point of contact for the company and the name on shipping documents, however, was Co-conspirator-1, an employee of Shenzhen Technology Company.  When agents visited the address, they discovered it was a co-working space and no individuals at the space knew of Colorado Company-1.  Agents did not identify a valid bank account or business activity for the Colorado Company.

45.     Agents also reviewed the bills of lading tied to exports handled by the New York Shipping Company during the five-day period between March 11 and March 16, 2025.  Agents discovered a bill of lading for three pallets of "adapter groups" with the intermediate and ultimate consignee listed as Hong Kong Logistics Company.  A review of the shipper's letter of instruction and invoices indicated that the shipment included 23 pieces of "Sandkyan Adapter Group," with an invoice in which Colorado Company-1 had sold the items to Hong Kong Logistics Company.  Based on the items being falsely described in the same manner as Houston Company-1's purchases and exports of GPUs, agents believe this was a shipment of Nvidia Tensor Core GPUs that was unlawfully exported to Hong Kong.

      b.   <u>Detention of Goods and UC Operation Leads to Ransom Payment of $1 Million to Release GPUs</u>

46.     Following law enforcement's removal of the Nvidia GPU baseboards from the New Jersey Warehouse on May 13, 2025, the recipient of the goods in New York indicated that they believed UC-1 had stolen the goods.  The government-controlled warehouse where the equipment was detained received numerous calls about the missing goods.  UC-1 then received information regarding a legal demand letter sent by another company registered in Colorado ("Colorado

Company-2") to the owner of the New Jersey Warehouse stating that the goods belonged to the company.

47.     Thereafter, UC-1 received contact information from the U.S. Logistics Company Representative of a Mandarin-speaking individual, Co-conspirator-4, on May 20, 2025.  UC-1 and Co-conspirator-4 began communicating via an encrypted messaging application.  Co-conspirator-4 believed UC-1 had stolen the disguised Nvidia GPUs from the warehouse.  Co-conspirator-4 was unaware that UC-1 was an undercover agent, and that the GPUs were detained by law enforcement.  UC-1 asked whether Co-conspirator-4 sent the demand letter.  Co-conspirator-4 confirmed that he asked "his lawyer" to send the letter and that he would ask the lawyer to stand down.  Co-conspirator-4 then offered to make a payment for release of the goods and negotiated terms in which UC-1 would release the GPUs in exchange for a payment of $1 million to a bank account (set up by the U.S. government) in Houston, Texas.  On May 21, 2025, Co-conspirator-4 informed UC-1 that $1 million would be deposited into the Houston account from a U.S.-based company, and Co-conspirator-4 requested that UC-1 generate a fictitious invoice to send to the U.S.-based company justifying the payment.  However, Co-conspirator-4 required that the GPUs be inspected and inventoried before the payment was made.  UC-1 requested the names of those who would be inspecting the mislabeled GPUs.  On May 23, 2025, Co-conspirator-4 sent the names of six individuals to UC-1.  As described below, agents identified at least four of those individuals as employees of IT Company.

> c.   <u>Yuan Organized the Inspection of GPUs in Warehouse Prior to Ransom Payment to Release GPUs</u>

48.     On May 21, 2025, Co-conspirator-3, who is a high-level employee of PRC IT Company and who reports to Co-conspirator-2 along with Yuan, invited Yuan to a messaging application group chat to discuss the retrieval of equipment held in the possession of UC-1.

Members of the group chat all believed UC-1 had taken possession of the Nvidia products and would not release them unless the $1 million payment was made and were unaware the equipment was detained by BIS Special Agents.  That group chat included Yuan, employees of PRC IT Company (Co-conspirators -2 and -3), and representatives from Hong Kong Logistics Company and Shenzhen Technology Company (Co-conspirators -1, -4, and -5).[5]

49.     In the group chat, on May 21, 2025, Co-conspirator-1 described a formal plan to retrieve the equipment, including meeting with UC-1 at a pre-determined location; traveling with UC-1 to a warehouse to observe the equipment; sending trucks to the warehouse to transport the equipment; having engineers inspect the equipment on-site; and arranging a wire transfer after the inspection in exchange for UC-1 releasing the equipment.

50.     Approximately two hours after the plan was detailed, Co-conspirator-5, who was also in the group chat, suggested they meet through a video-conferencing application.  Screenshots of Co-conspirator-5's social media profile in the messaging application show a photo of a large group holding a Shenzhen Technology Company banner bearing the caption "My brothers and I are particularly outstanding" in Mandarin, indicating Co-conspirator-5 was likely acting on behalf of Shenzhen Technology Company.

51.     A few minutes later, an unidentified user ("UU-1"), who appeared to be affiliated with Hong Kong Logistics Company, sent a link to a virtual meeting.  Moments later, Co-conspirator-2 suggested that Yuan go ahead and speak with Co-conspirator-3 and others from Hong Kong Logistics Company.  Co-conspirator-2 also added that [Hong Kong Logistics Company] is a "best friend" of [PRC IT Company], has helped them a lot, and "[we are] making

---

[5] Specifically, the group chat included an individual with a username with the same first name as Co-conspirator-1.  According to CW-1, stated to agents this individual in the group chat was in fact Co-conspirator-1.

18

an all-out effort." Less than fifteen minutes later, Yuan responded that he was available, and based on messaging application records, it appears a virtual conference occurred.

52. Approximately nineteen minutes later, UU-1 sent to the group chat a link to a .docx file titled "U.S. Goods Inspection Merchandise Details." This document was identical to the paperwork the six inspectors had on May 27, 2025, described below, which contained an inventory of all the equipment expected to be in the New Jersey Warehouse. The document also contained several images of Nvidia HGX H200 baseboards, which were relabeled "SANDKYAN" and an inventory of items, including "91 H200 GPU baseboards, 43 A100 GPU modules, 14 cards, 2 whole servers, and 29 motherboards."

53. On May 21, 2025, after forwarding the inspection document, UU-1 addressed Yuan directly and informed him that the document contained details to verify the goods during inspection. One hour later, Co-conspirator-1 provided a location in New Jersey and informed Yuan it was the approximate location of UC-1's warehouse. Co-conspirator-1 further explained to Yuan that the inspectors must register in advance and requested that Yuan provide personnel information including the names and driver's license numbers for the inspectors who would examine the Nvidia products. The inspection was originally planned for Friday, May 23, 2025.

54. Approximately forty-five minutes later, Co-conspirator-1 said, "Manager Yuan, just finished negotiations with the other party." About thirty minutes later, another unidentified group chat member, UU-2, asked whether it would be "possible for [PRC IT Company] to cut a check? Or something along those lines could speed up the payment process." In response, Co-conspirator-2 said, "Manager Yuan, if you could look into it."

55. About fifteen minutes later Yuan asked that if the money did not arrive by Friday, whether "all of us" would head home and then "come back on Tuesday to check the merchandise and pick everything up." Co-conspirator-1 responded that this was still under discussion.

56. As to the question regarding a check, approximately ten minutes later, Yuan responded by inquiring how much. UU-2 stated it was $1 million USD. Yuan responded that the amount was large and difficult. In the evening of May 21, Co-conspirator-1 informed Yuan that the inspectors would need to meet and perform the inspection on Tuesday, May 27, 2025. Co-conspirator-1 informed Yuan that following the inspection, the inspectors would need to remain and watch the equipment until the items were picked up that afternoon. Yuan acknowledged the message and said, "sounds good." Co-conspirator-1 asked Yuan to arrange for the personnel and send Co-conspirator-1 the names and driver's license numbers or passport numbers. Co-conspirator-1 then asked Yuan to put the "engineers" into a group chat so they could communicate in a group about the inspection details.

57. On May 22, 2025, Yuan asked Co-conspirator-1 if they were confirmed to meet on Tuesday, May 27, 2025, and stated he would provide the inspectors' information on May 23, 2025.

58. On May 23, 2025, UU-1 asked Yuan for the names of the inspectors and notified the group that the equipment would be picked up by three trucks. Co-conspirator-1 then messaged the group requesting that Yuan direct the engineers not to tell UC-1 about "where the merchandise is going" and "Don't mention any information about [our] end in China and don't talk about who made arrangements for everyone." A few minutes later, Yuan responded "Alright."

59. On May 23, 2025, Co-conspirator-2 addressed Yuan, stating that CW-1 "will soon be arranging for his associates, [should we] pull him into the group chat? You and [CW-1] should

first go over what it is you are going to do; if anything is unclear, you can have [Hong Kong Logistics Company's] colleagues explain it again."

60.     Later the same day, on May 23, 2025, Co-conspirator-2 urged Yuan to make the arrangements quickly, emphasized that it was very important, and requested that Co-conspirator-3 and Yuan quickly coordinate with each other about the inspection.  Approximately one hour later, Yuan messaged the names and ID numbers (last four digits of their driver's license number) for six individuals scheduled to inspect the Nvidia GPUs and equipment and requested confirmation of the warehouse location.  The names and ID numbers for the inspectors matched the identities of the six inspectors Co-conspirator-4 provided to UC-1 before the inspection.

61.     On May 27, 2025, BIS conducted an undercover operation to observe the inspection of the mislabeled GPUs.  UC-1 and other undercover agents watched as the inspectors arranged by Yuan opened each box of GPUs, verified that each box contained the mislabeled GPUs, and inventoried each box's contents.  Agents saw that the inspectors carried packets of instructions written in English and Mandarin.  The instructions had photographs of Nvidia labels, and Nvidia baseboards altered with the "SANDKYAN" labels.  The inventory list possessed by the inspectors included: "91 H200 GPU baseboards, 43 Nvidia A100 GPU modules, 14 cards, 2 whole servers, and 29 motherboards."

62.     After the inspectors completed their inventory of the GPUs, Co-conspirator-4 informed UC-1 that $1 million was wired to the Houston-based bank account.  Co-conspirator-4 confirmed the payment by sending screenshots of wire payment authorization to the Houston account, through a messaging application.  After confirming receipt of the funds, UC-1 informed Co-conspirator-4 that the cargo could not be loaded until the next morning because it was too late in the day.

63.     The next morning, May 28, 2025, three semi-trucks arrived – just as Co-conspirator-1 had previewed in a message on May 23, 2025 – to retrieve the GPUs.  However, BIS Agents arrived, placed the warehouse contents, including the GPUs, under detention and moved them to a government storage facility.

64.     On May 27, 2025 (the day of the "inspection" by IT Company employees) and May 28, 2025 (the day BIS detained the goods), two individuals were present outside the warehouse.  A BIS agent spoke with one of the individuals who identified himself as the attorney for Colorado Company-2 and gave the BIS agent his contact information and business card.  The attorney worked for a law firm based in the PRC.

65.     In total, BIS detained: 91 units of NVIDIA HGX H200 141GB 700W 8-GPU Baseboards (ECCN 4A090.a); 20 Units of NVIDIA HGX GPU 8x A100 640GB baseboards (ECCN 4A090.a); 6 Units of SuperMicro SuperServer 420GP-TNAR/420GP-TNAR+ (ECCN 5A002.z); 25 units of SuperMicro A+ server configured with A100 baseboards (5A002.z); 14 boxes of 10 units H200 (ECCN undeterminable because of unknown specifications); 23 NVIDIA baseboards (unknown part and model due to label modifications).  These GPU baseboards and servers were worth approximately $30.3 million.

66.     Based on the information available to agents regarding the controlled servers, GPUs and baseboards, BIS agents did not identify any valid export licenses or license applications for these detained items.

67.     Regarding the detention of equipment, on May 28, 2025, Co-conspirator-3 addressed Yuan, stating "I'm thinking this is how to initially reply: if DHS reaches out to [an engineer who inspected the GPUs], who went over today, then have him say that the company arranged for him to come by for the inventory.  If DHS emails our HR, then have HR notify us,

and then we can consider how to respond." Yuan replied, "What is [Hong Kong Logistics Company's] relationship to these goods? We need to figure out what to say in our response as quickly as possible (based on the facts); if DHS starts investigating, then time is going to get really tight."[6]

68.  Also on May 28, 2025, UU-2 added another unidentified user ("UU-3") to the group chat. UU-2 immediately notified the group that the products were detained by the U.S. Department of Commerce. Another unidentified user in the group chat, ("UU-4"), responded stating the trucks were cancelled and that the truck driver reported there were many police officers at the scene asking where the cargo was going. UU-4 stated he "told his proxy to just say they don't know anything." Five minutes later, UU-2 sent a message stating "dissolve this group chat. Delete everyone."

### 3. Yuan Was Involved in Developing a Potential Response to USG Using False Information Regarding Detention of GPUs From New Jersey Warehouse

69.  On May 29, Yuan addressed Co-conspirator-2 and Co-conspirator-3 in their group chat, inquiring, "what progress has there been on the matter of the [Hong Kong Logistics Company] New York merchandise?" Co-conspirator 2 responded, "Nothing thus far" and "[Has someone] contacted us?" I understand these messages were related to the goods detained from the New Jersey Warehouse.

70.  On June 3, 2025, BIS sent a notice regarding the detention of controlled goods to the attorney who was physically present on May 27, 2025 and May 28, 2025 outside the warehouse.

---

[6] I understand DHS to refer to the Department of Homeland Security. I understand that the co-conspirators believed that DHS was the law enforcement agency that detained the GPUs and other equipment. On June 3, 2025, BIS sent a detention notice and the co-conspirators correctly referenced BIS after that time.

71. On June 4, 2025, Yuan, and Co-conspirators 2 and 3 conducted a virtual meeting to discuss the detained GPUs. On June 5, Co-conspirator-2 sent a pdf document titled "Equipment Procurement Framework" (in Mandarin). This document outlined various supply chain scenarios. One of the scenarios contemplated a purchase from a U.S. supplier by Singapore Company-1, a sale to [Colorado Company-2] then a lease to IT Company. Another scenario contemplated a further step where IT Company subleased the goods to another U.S. company.

72. On June 6, 2025, Co-conspirator-2 added Yuan to a group chat named "Responding to U.S. Cargo Detention Issues," a conversation about ongoing issues with export-controlled Nvidia products that were detained by BIS from the New Jersey Warehouse. UU-3 began the conversation addressing Co-conspirator-2 and stating that compliance paperwork was required to purchase the GPUs from a U.S. supplier. UU-3 explained that, because there had been changes to the procurement chain, it was possible IT Company would "absorb the shipment." UU-3 noted some of the items on the compliance paperwork needed to be redone. UU-3 further explained the correct method to fill out end user and purpose paperwork for the following products, in what appeared as an attempt to circumvent U.S. export controls:

> Module
> End User: USA (domestic use in US, stock for maintenance services)
> Purpose: large-scale HPC Simulations (backup support)
>
> Server
> End User: local services, computing power rental
> Purpose: large-scale HPC simulations research (electric vehicles/education/healthcare/social media)
>
> H200 Cards
> End User: USA(domestic use, stockpile for maintenance services)
> Intended Use: large-scale HPC simulation (backup support)

73. On June 6, 2025, Co-conspirator-2 posted a word document in a group chat that included Yuan and Co-conspirator-3, titled "Overview- US Merchandise Investigation Response.docx." The document included what appears to be a summary of events and issues that required explanation and offered ideas to cover up what transpired. Specifically, the document included the following:

**Order, delivery, and logistical timelines for the merchandise:**
1. The [Purchase Order] for this batch of goods was between March 3rd and May 7th; the date of the invoice was between April 30th and May 9th; and the delivery was taken between April 30th and May 9th.

2. After taking delivery, the merchandise arrived at the warehouse between May 2nd and 11th (Los Angeles warehouse/New Jersey warehouse); on May 15th, [the representative of U.S. Logistics Company] moved the goods from the NJ warehouse A to NJ warehouse B.

3. May 27th, engineers from [IT Company] travel to warehouse B for the goods inspection.

4. May 28th, the goods were detained by BIS.

5. All times presented are in US time.

**Sorted issues that still need to be resolved:**
1. Did [IT Company] purchase the equipment from [Colorado Company-2] or [Singapore Company-1]? Consider the following problems:
1) [Colorado Company-2] is actually a shell company that cannot stand up to in-depth scrutiny by BIS.
2) If the goods were procured from [Singapore Company-1], it might lead BIS to target [Singapore Company-1] for in-depth investigation, for example by retrieving [Singapore Company-1]'s records in the bank SWIFT system;
3) If the decision is made to use [Colorado Company-2], then suitable cover will have to be provided for the company, for example, building a simple company website.

25

2. There's no way to explain procurement of the 100x H200 cards (belonging to another owner) and the 29x motherboards found and detained at Warehouse B.

3. [Colorado Company-2]'s compliance documents need [to reflect] the buyer information for [Singapore Company-1] and the end use.

4. Missing records of communication and transaction documents that would have been exchanged between [Singapore Company-1, [Colorado Company-2], and [IT Company] for this batch of goods. After determining the path of transaction for the goods, also need to fill in the corresponding contracts/[purchase orders]/invoices.

5. Is it necessary to carry out filing procedures for [IT Company]'s purchase of these goods?

6. The following issues [when addressing] inquiries from the US lawyer: [Since] [IT Company] is a US company with a background of Chinese capital, does the path of transaction we designed for procuring this equipment violate US EAR regulations? Are there any other potential risks for our prepared path of transaction under US regulatory requirements?"

74.     On June 7, 2025, Yuan responded with a voice note to Co-conspirator-2, summarizing his understanding of the documents BIS was requesting, including the invoice and proof of payment. Yuan said if "it's being switched" to IT Company being the client, the "time is wrong" on some of the documents related to the transaction. Yuan further stated, "don't you think manipulating this…wouldn't it be quite obvious? They would definitely have doubts…" He added that now that U.S. law enforcement was involved there should be "deliberation on this thing with the documents." I understand these messages to show Yuan stating that the inconsistencies in the underlying documents would make it obvious that IT Company is not or was not the customer for the GPUs.

**4. For a Separate Batch of GPUs, Yuan Directs the Storage of GPUs in IT Company's Offices, Removal of Nvidia Labels and Eventual Export of GPUs**

75.    In addition to the detained equipment from the New Jersey Warehouse, Yuan also directed actions regarding a separate shipment of 85 GPUs.   Specifically, Yuan discussed the storage of GPUs with Co-conspirators -2 and -3 at IT Company's offices after BIS detained the $30 million of equipment on May 13, 2025.   On May 17, 2025, Co-conspirator-2 addressed Yuan, requesting a voice call because Co-conspirator-2 was "doing a favor for a friend and need[ed] to find a warehouse on short notice."   After the voice call, Yuan sent the address of IT Company's offices in Sterling, Virginia with a "Point of Contact" as CW-1.   On May 18, 2025, when asked by Co-conspirator-3 if the office had 50-60 square meters of space, Yuan replied, "GPU Servers? Storing for how long?"   Over the next few days, Co-conspirator 3 continued detailing the qualities of the warehouse needed for storage including that "It shouldn't be in one of those large and open public warehouses," and "have your associates at [IT Company] search around for an industrial building nearby."

76.    On May 28, 2025, CW-1 notified agents that a shipment of Nvidia GPUs was being stored inside the office of IT Company in Sterling, Virginia.   CW-1 provided agents with photographs of marked Nvidia boxes.   The following day, on May 29, 2025, CW-1 notified agents that CW-1 was contacted via a messaging application by Co-conspirator-5.

77.    Co-conspirator-5 instructed CW-1 to remove all Nvidia product labels from the GPUs and repackage and relabel the parcel inside IT Company's office for a potential shipping date of May 30, 2025.

78.    On May 29, 2025, Co-conspirator-3 posted a Group Chat History of messages from Co-conspirator-5 in the group chat with Yuan and Co-conspirator 2, which were communications between Co-conspirator- 5 and CW-1:

27

Good morning [CW-1], when you get to work on Friday, could you please help take care of the goods at the office? We've arranged for someone to come collect them, so if you could help out with the following:

1. Is the one big box on the ground product that we are holding temporarily? If not, do those 25 smaller boxes in total belong to us?

2. Please open all of the outer boxes and remove the labels with the words Nvidia from the smaller packages. You can use a box cutter to remove them. There are 85 smaller packages in total that need to get done.

3. Once you're finished with that, please reseal the boxes. If there's any stretch wrap, please wrap the individual boxes up and print out the "exterior box [shipping] mark," one for each of however many boxes there are then stick them on the outside of each box.

79.     On May 29, 2025, in a group chat that included Co-conspirator-5 and Co-conspirator-3, CW-1 asked, "What is it we need to do for him? I see he listed a bunch of things in the group chat."   I understand "him" to be referring to Co-conspirator-5.   In response, "Co-conspirator-3 stated that he spoke with Yuan and discussed what needs to be done with the GPUs.  Co-conspirator-3 further continued and explained that CW-1 only needed to confirm the number and size of the boxes of GPUs and "as for the labels, you can just say you're waiting for your boss's instructions."  When CW-1 asked, "Should I respond to [Co-conspirator-5] in the group chat?" Co-conspirator 3 responded, "Manager Yuan does not want that done.  He's concerned there could be problems."  CW-1 later informed law enforcement that CW-1 believed that this message meant Yuan compromised with the removal of the labels but did not want the fake labels to be applied to the Nvidia GPUs as requested by Co-conspirator-5 because it would be suspicious.  On May 30, 2025, after CW-1 completed the task, he provided the removed Nvidia labels to agents.

80.     Also on May 30, 2025, CW-1 was contacted by a logistics company headquartered in Shenzhen, China ("Shenzhen Logistics Company"), which also transports within the United States and Canada, to arrange for the transportation of the GPUs.  On June 2, 2025, the GPUs were picked up at IT Company's office in Sterling, Virginia.  CW-1 sent agents a photo of the bill of lading listing IT Company as shipper.  Agents tracked the shipment of GPUs from Virginia to a logistics warehouse in New Jersey.  Records obtained during the investigation showed that Singapore Company-1 purchased these GPUs from Massachusetts Company-1 and shipped them under the name of Colorado Company-2, but used IT Company's Virginia address.

81.     On June 2, 2025, CW-1 received an unexpected package from Hong Kong, China, which was delivered to IT Company's office on May 30, 2025.  When CW-1 opened the package, he discovered it was filled with hundreds of preprinted labels, including new barcodes and "SANDKYAN" product labels identical to those placed on the GPUs in the New Jersey Warehouse.

82.     On June 3, 2025, BIS agents conducted an industry outreach at the logistics warehouse in New Jersey that received the GPUs that were picked up from IT Company's office.  Warehouse employees told the agents they only handle imports – no exports – and that their business model is importing from China.  Agents located the GPUs from IT Company, but the pallet was adorned with counterfeit labels, misidentifying the GPUs as "Contactor controllers," which matched the labels Co-conspirator-5 had forwarded to CW-1.  The Nvidia GPUs were palletized and identified as being made in Taiwan.  When questioned about the pending export inside an import-only warehouse, employees explained that their headquarters was notified that a customer needed temporary storage at its facility with no additional information.  The packing slip for the GPUs showed the shipment was purportedly for export to a company located in Germany ("German Company").  Certain elements of the export documents bore similarities to other

29

shipments that BIS was investigating. That is, the packing list for the export showed the same address in Colorado as documents from the exports of GPUs to Canada involving Hong Kong Logistics Company. Specifically, the address on the packing list was the same address as Colorado Company-1's address, listed as the shipper on EEI filings for the exports to Canada that went onward to Hong Kong, described in Paragraph [44]. Furthermore, registration documents for German Company revealed the company was registered at the German consulate in China by Co-conspirator-1 using his PRC passport.

83.     However, after the agents visited the warehouse, agents learned that the commercial documents and freight forwarder for these GPUs had suddenly changed. On June 6, 2025, agents learned of and requested records for the GPUs that were pending export to Taiwan via airfreight on June 8, 2025. The mislabeled GPUs were booked for transport by air from Newark, New Jersey to San Francisco, California, and then to a company in Taipei, Taiwan. The shipper and USPPI was identified as Massachusetts Company-1; the commodity description was "Contactors Controller, Non-Hazardous." The packing list, commercial invoice, and airway bills identified the items as "PCIE Modules" – 85 PCIE Modules packaged in 26 boxes. PCIe modules, also known as PCI Express modules, are high-speed modules that are used to connect various hardware components, including GPUs. Depending on the exact specifications, PCIe modules are often classified under ECCN 5D002 or classified as EAR99. The end-user certifications were signed by a Singapore company ("Singapore Company-1"). On that same day, June 6, 2025, BIS informed the freight forwarder that the shipment was detained.

84.     On June 7, 2025, Co-conspirarator-2 left a voice note stating, "Mr. Yuan, so that matter of the merchandise today, just forget it, yeah?…they just had a meeting, and the thinking is that after this… it's too risky…so just don't look into it."

85.     On June 10, 2025, agents conducted a physical inspection of the GPU shipment that was shipped from IT Company's offices.  The shipment consisted of one pallet, which contained 26 individual boxes.  The agents opened each box and confirmed its contents.  In total, the shipment contained 85 Nvidia A100 SXM4 80GB w/HS (3U) GPUs. Nvidia A100 GPUs are classified under ECCN 3A090.a, which require licenses for export to the PRC, including Hong Kong.  These GPUs were worth approximately $663,000.

86.     On June 14, 2025, UU-2 messaged Co-conspirator 1 in the group chat and requested an update regarding the 85 GPUs.  Co-conspirator-1 replied that BIS responded and requested documentation related to the shipments, which the freight forwarder was unable to provide.  Co-conspirator-1 stated he provided the freight forwarder with two documents and sent a link to a .pdf file titled "PCIE Module Catalogue," and a screenshot showing flight information for the Massachusetts Company-1 shipment from Newark, New Jersey, to San Francisco, California, with a final destination of Taipei, Taiwan.  The screenshot also included an inventory description of "contactors controller, non-hazardous."  These documents appeared to refer to the shipment of 85 Nvidia GPUs, model: A100 SXM4 80GB w/HS (3U) that BIS detained on June 10, 2025, after tracking it directly from IT Company's office, as referenced in Paragraph [82].

87.     Based on the information available to agents regarding the shipments of controlled GPUs, BIS agents did not identify any valid export licenses or license applications for these detained items 85 A100 GPUs classified under ECCN 3A090.a

## CONCLUSION

88.     Based on my training and experience, and further supported by the facts in this affidavit, I submit that there is probable cause to believe that Benlin Yuan has conspired to violate

ECRA and the EAR in violation of 50 U.S.C. §§ 4819 (a)(1), (a)(1)(A), (a)(2)(D), and (b); and 15 C.F.R. §§ 736.2(b)(1), 742.6, and 764.2 and part 774, Supp. No. 1.

Respectfully submitted,

_Tyler Fox_
_____
Tyler Fox, Special Agent
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement


Subscribed and sworn to before me telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 28th day of November 2025, and I find probable cause.

_____
Hon. Richard W. Bennett
United States Magistrate Judge

# EXHIBIT B

AO 91 (Rev. 11/11)  Criminal Complaint

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

# UNITED STATES DISTRICT COURT
for the

Southern District of Texas

United States Courts
Southern District of Texas
FILED

*December 02, 2025*

Nathan Ochsner, Clerk of Court

| United States of America | ) | |
| v. | ) | Case No. **4:25-mj-718** |
| Fanyue GONG, aka Tom | ) | |
| | ) | **FILED UNDER SEAL** |
| *Defendant(s)* | ) | |

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _November 1, 2023, to present,_ in the county of _Fort Bend_ in the _Southern_ District of _Texas_, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 554 | Smuggling Goods from the United States |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Christopher O'Neill, Special Agent, Dept. of Comm.
*Printed name and title*

Attested to by the Complainant in accordance with the requirements of Fed. Crim. P. 4.1. by telephone.

Date: _12/02/2025_

_____
*Judge's signature*

City and state: _Houston, Texas_

Hon. Christina A. Bryan, U.S. Magistrate Judge
*Printed name and title*

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

**4:25-mj-718**

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
### "ATTACHMENT A"

I, Christopher O'Neill the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

I am a Special Agent with the United States Department of Commerce, Bureau of Industry and Security ("BIS"). I have been so employed since May 2016, and I am currently assigned to the Office of Export Enforcement's New York field Office. Prior to my employment with BIS, from 2010 until May 2016, I was a Special Agent with the Air Force Office of Special Investigations, where I participated in criminal investigations concerning offenses against the Air Force, Department of Defense, and U.S. Government. As a BIS Special Agent, I am charged with investigating the unlawful export of goods and commodities controlled for export by the Department of Commerce, including firearms and technology, for reasons of national security and/or foreign policy. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations into alleged violations of federal law. Since joining BIS and the Office of Export Enforcement, I have investigated, among other things, violations of the Export Control Reform Act, 50 U.S.C. §§ 4801-4852; Smuggling of Goods from the United States, in violation of 18 U.S.C. § 554; and Submitting False Export Documents, in violation of Title 13, United States Code, Section 305.

This affidavit is made in support of a criminal complaint charging **Fanyue GONG**, aka "Tom," with conspiring to smuggle goods from the United States, in violation of 18 U.S.C. §§ 371 and 554.

I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses,

1

and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested Criminal Complaint.  It does not set forth all my knowledge, or the knowledge of others, about this matter.

## LEGAL BACKGROUND

1. **Export Control Reform Act (ECRA) and Export Administration Regulations (EAR)**

1. The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items . . . be controlled." 50 U.S.C. § 4811(2).  To that end, ECRA grants the President the authority to control, among other activities, "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons." *Id*. at § 4812(b).  ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id*. at § 4813(a).

2. Pursuant to ECRA, the Department of Commerce reviews and controls the export of certain items, including commodities, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774.  In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  The EAR impose licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or re-exported lawfully from one foreign destination to another.

3. The most sensitive items subject to EAR control are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1.  Items on the CCL are categorized by

2

an Export Control Classification Number ("ECCN") based on their technical characteristics. Each ECCN has export control requirements depending on the destination, end user, and end use.

4. The EAR establish the responsibility of Department of Commerce, Bureau of Industry and Security ("BIS") to approve or deny export license applications with the input of other federal agencies. If a license is required for a transaction subject to the EAR and the transaction does not qualify for a specific license exception, a U.S. person must submit a license application to BIS and receive a license prior to engaging in the transaction. The license may be subject to certain terms and conditions defined by BIS or other federal agencies.

## 2. Advanced Computing/Supercomputing Interim Final Rule (AC/S IFR)

5. Beginning on October 7, 2022, BIS began amending the EAR to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items, including certain Nvidia-manufactured Graphic Processing Units ("GPUs"), through an interim final rule (effective on October 7, 2022). *See* 15 C.F.R. § 744.23; 87 Fed. Reg. 62186 (Oct. 7, 2022). The purpose of the rule is "to protect U.S. national security and foreign policy interests by restricting the [People's Republic of China's] access to advanced computing for its military modernization, including nuclear weapons development, facilitation of advanced intelligence collection and analysis, and for surveillance." BIS further imposed additional export controls on certain advanced computing semiconductor chips (chips, advanced computing chips, integrated circuits, or ICs), transactions for supercomputer end-uses, and transactions involving certain entities on the Entity List. These restrictions applied to high-performance ICs that are useful in data center processing and artificial intelligence, with a total processing performance of 4800 or more, or a total processing performance of 1600 or more and a performance density of 5.92 or more. These controls and restrictions applied to the People's Republic of China ("PRC"), including Hong Kong and Macau.

6. On October 25, 2023, BIS released an interim final rule (effective on November 17, 2023) that expanded the export controls related to advanced computing and semiconductors, including with respect to additional Nvidia-manufactured GPUs, which had been developed specifically for the PRC following the October 7, 2022 restrictions. According to the interim final rule, "[t]hese revisions protect U.S. national security interests by further restricting China's ability to obtain critical technologies to modernize its military capabilities in ways that threaten the national security interests of the United States and its allies." 88 Fed. Reg. 73458 (Oct. 25, 2023).

**3. Export Restrictions on Relevant GPUs, Baseboards, and Servers**

7. There are several Nvidia products described below that the defendant and his co-conspirators conspired to unlawfully smuggle outside the United States, all of which were subject to specific export restrictions and requirements relevant to this Affidavit.

8. The following items are classified under ECCN 4A090.a: Nvidia H100 GPUs; Nvidia H200 GPUs; Nvidia H200 GPU baseboards; Nvidia HGX A100 8-GPUs; and Nvidia HGX A100 640 GB GPU baseboards. Items classified under ECCN 4A090.a are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

9. The following item is classified under ECCN 3A090.a: Nvidia A100 GPU 80GB SXM4. Items classified under ECCN 3A090.a are controlled for regional stability (RS) and anti-terrorism (AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

10. The following items are classified under ECCN 5A002.z: SuperMicro SuperServers 420GP-TNAR/420GP-TNAR+ and SuperMicro A+ servers configured with A100 baseboards. Items classified under ECCN 5A002.z are controlled for regional stability (RS) and anti-terrorism

(AT) reasons and require a license for export to the PRC, including Hong Kong. See 15 C.F.R. 742.6(a)(6)(iii)(A).

### 4. Smuggling

11. Pursuant to Title 18, United States Code, Section 554, it is unlawful to fraudulently or knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

### 5. Unlawful Export Information Activities

12. Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States.  Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

13. The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States.  Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more.  EEI also is required, regardless of the value of the goods, if the goods require an export license. 15 C.F.R. §§ 758.1 and 30.2.

14. Title 13, United States Code, Section 305, makes it a federal crime to knowingly fail to file or to knowingly submit false or misleading export information through the SED, EEI, or the AES, or to otherwise use the SED or the AES to further any illegal activity.

## DEFENDANT AND RELEVANT PARTIES

15. The defendant, **Fanyue GONG**, aka "**Tom**," is a resident of New York and the owner of a technology company located in Brooklyn, New York ("New York Technology Company").

16. Co-conspirator-1 is an employee of a Shenzhen, China-based technology company that is a supplier of AI equipment and provides services related to import and export declarations ("Shenzhen Technology Company"). Co-conspirator-1 is also connected to a Hong Kong-based shipping and logistics company ("Hong Kong Logistics Company") that is affiliated with Shenzhen Technology Company. For example, certain public financial records describe Hong Kong Logistics Company as part of the corporate network of Shenzhen Technology Company.

## SUMMARY OF PROBABLE CAUSE

17. BIS, Homeland Security Investigations ("HSI"), and the Federal Bureau of Investigation ("FBI") are investigating a sophisticated illicit procurement conspiracy and smuggling network that is orchestrating the purchase and export of Nvidia A100, H100, and H200 Tensor Core GPUs and HGX baseboards, which are used for artificial intelligence ("AI") applications and high-performance computing ("HPC"), to the PRC, including Hong Kong, and other destinations, in violation of U.S. export and other laws. Specifically, a GPU is an electronic circuit that can perform calculations at high speed, key to processing the vast amounts of data used to train AI applications. A tensor core is a specialized processing unit within a GPU that is designed to accelerate matrix operations, which are used in AI, deep learning, and HPC tasks. A GPU baseboard is a server platform that integrates multiple high-performance GPUs. A GPU server is a kind of server that has additional GPUs in addition to standard Central Processing Units (CPUs) – a CPU is the primary component of a computer that is key to running a computer's

operating system and applications.  These technologies are dual-use, i.e. they are used for both civilian and military applications.

18. From at least in or about November 2023, Hong Kong Logistics Company and its co-conspirators have engaged in a conspiracy to unlawfully export Nvidia technologies from the United States to the PRC.  **GONG**, along with known and unknown coconspirators, conspired to smuggle from the United States, or attempted to do so, Nvidia GPUs and baseboards, in violation of 18 U.S.C.  §§ 371 and 554.

19. As part of the overall scheme, employees of Hong Kong Logistics Company and Shenzhen Technology Company conspired to violate U.S. laws by obtaining export-controlled Nvidia GPUs through straw purchasers and intermediaries, including in the Southern District of Texas, and falsely indicating that the goods were for U.S. customers or customers in third countries such as Taiwan or Thailand.  The GPUs were shipped to multiple U.S. warehouses, where individuals removed Nvidia labels and relabeled the GPUs with labels bearing the name "SANDKYAN" – believed to be a fake company – and then prepared the goods for export.  The shipping and export paperwork, submitted in AES, also misclassified the goods as "adapters," "adapter modules," or "contactor controllers."  The co-conspirators then shipped the goods or attempted to do so, directly or indirectly, to the PRC and Hong Kong in violation of U.S. export and other laws.

20. As further described below, on or about May 10, 2025, agents investigating this conspiracy received information regarding pallets of Nvidia GPUs being stored in a U.S. logistics company's ("U.S. Logistics Company") leased New Jersey warehouse ("New Jersey Warehouse") that were destined for the PRC.  When agents visited the New Jersey Warehouse two days later, including an undercover agent ("UC-1"), they observed individuals relabeling the Nvidia GPUs

with labels for the fake company (SANDKYAN).  As further detailed below, agents subsequently detained the GPUs and moved them to another government-controlled facility.

21.  Defendant **GONG** directed a key part of the conspiracy by hiring individuals, referred to as "engineers," to "test and inspect" the goods.  But in fact, **GONG** directed the "engineers" to *relabel* Nvidia GPUs with fake company labels to conceal their origin, in preparation for the GPUs to be smuggled outside the United States in violation of U.S. laws.

22.  One of the engineers, Engineer-1[1], informed agents that **GONG** had directed Engineer-1 to relabel boxes of GPUs located at various warehouses in New Jersey.  Engineer-1 did this relabeling for **GONG** on four or five occasions.  Engineer-1 received the addresses and phone numbers of the warehouses from **GONG** through an encrypted messaging application group chat containing 20-30 individuals.[2]  Some of the members of the group chat appeared to be in the PRC based on phone numbers associated with a PRC code.  Engineer-1 informed agents that one individual on the group chat who had trained Engineer-1 on how to relabel goods before Engineer-1's first job was a PRC national who had traveled back to the PRC.

23.  **GONG** paid Engineer-1 in cash and/or by check and Engineer-1 used **GONG's** vehicle to drive to the worksites.  Engineer-1 stated that the labels he and his co-workers used to relabel the items, as well as the boxes, were always located at the warehouse prior to his arrival and were left at the warehouse when they departed.  The boxes were repackaged after Engineer-1 left the warehouse.  Engineer-1 did not know what happened to the packages after he departed.

---

[1] On May 29, 2025, Engineer-1 was arrested in New York for Improper Entry by Alien in the Southern District of Texas.  Engineer-1 provided a post-*Miranda* statement to law enforcement. On July 25, 2025, agents interviewed Engineer-1 with his attorney present.

[2] All communications described in this Complaint regarding the messaging application occurred in Mandarin, unless otherwise noted, and the communications referenced here are translations.

24. According to Engineer-1, **GONG** had never disclosed the purpose of relabeling the boxes, though Engineer-1 suspected that "it was not a good thing." Engineer-1 knew that the items were Nvidia products and "new technology," and from watching the news and social media videos, Engineer-1 knew that such items had export restrictions from the United States. Specifically, Engineer-1 had watched videos on PRC-based video-sharing platforms showing that these items could not be exported to the PRC. Engineer-1 suspected that the items he saw in these videos were the same items that he was relabeling and that were discussed in the group chat.

## STATEMENT OF PROBABLE CAUSE

1. **Houston Company-1 Purchased Export-Controlled GPUs on Behalf of Hong Kong Logistics Company, Which Were Transported and Stored by Same U.S. Logistics Company as the GPUs Relabeled by Engineers Hired by GONG**

25. From October 2024 to May 2025, Houston Resident-1, utilizing his company, Houston Company-1, knowingly purchased and smuggled export-controlled Nvidia H100 and H200 GPUs out of the United States. Those GPUs were ultimately exported to the PRC and Hong Kong.

26. Specifically, Houston Company-1 purchased at least $60 million worth of GPUs from a U.S. global technology company ("U.S. Global Technology Company"). Houston Company-1 received funds from various entities to facilitate the purchases, including companies based in the PRC. Houston Company-1 received at least $1.5 million directly from Hong Kong Logistics Company and received other funds indirectly – for example, using front companies – from PRC companies. Shipping records show that GPUs purchased from U.S. Global Technology Company by Houston Resident-1 were ultimately exported to the PRC, including by transshipping the GPUs through Singapore and Malaysia, without the required licenses from the Department of Commerce.

27. On March 14, 2025, Houston Company-1 scheduled GPUs for pickup at U.S. Global Technology Company's distribution center. The GPUs were then shipped to U.S. Logistics

Company's warehouse in New York.[3]  Shipping records confirmed the GPUs arrived at that warehouse on March 15, 2025.  During an interview of U.S. Logistics Company's representative ("U.S. Logistics Company Representative") in May 2025, agents learned that the GPUs arrived at the warehouse at the request of a PRC-based logistics company ("PRC Logistics Company").

28. According to the U.S. Logistics Company Representative, the U.S. Logistics Company handled the receiving, warehousing, palletizing, and shipping of domestic freights for PRC Logistics Company.  The orders typically included only the number of pallets, weight, and dimensions of the goods to be shipped; the orders did not include a description of the contents, which would typically be included as part of paperwork in the normal course.  The U.S. Logistics Company Representative provided agents with copies of delivery orders of shipments from the New Jersey Warehouse.  The delivery orders included "shipping mark" numbers formatted with the prefix "SD" followed by a number.

29. According to the U.S. Logistics Company Representative, whenever a shipment arrived at U.S. Logistics Company's warehouse, the PRC Logistics Company would arrange for "engineers" to visit the warehouse for testing and inspection of the goods.  The U.S. Logistics Company Representative had, on at least one occasion, been present during the engineers' testing and inspection of a shipment and observed that the contents of the shipments were all marked "Nvidia."  Photographs taken by U.S. Logistics Company Representative during the testing/inspection, and provided to agents, show a box of opened Nvidia products, which agents believed to be export-controlled Nvidia GPU baseboards.  Additional photographs show the engineers working on at least four pallets of items, all of which appear to be Nvidia HGX baseboards.

---

[3] U.S. Logistics Company then began leasing another warehouse in New Jersey because of a pricing dispute which is later described in the Affidavit.

30. Once testing and inspection were completed, the engineers repackaged the products, and U.S. Logistics Company arranged for the packages to be re-palletized before they were shipped via truck to a New York shipping company's ("New York Shipping Company") leased warehouse space in New York ("New York Warehouse"), as requested by the PRC Logistics Company. Every shipment that U.S. Logistics Company handled for the PRC Logistics Company was routed to go to the same New York Shipping Company's New York Warehouse.

31. All communication between the PRC Logistics Company and the engineers was in Mandarin and done via an encrypted messaging application. The U.S. Logistics Company Representative provided agents with identifiers of individuals who were "engineers" that came to the warehouse. Agents identified three of the engineers based on photographs and identifiers provided by the U.S. Logistics Company Representative. Agents determined that all of them were PRC-nationals. Engineer-1 was one of the engineers. Engineer-1 was identified as having unlawfully entered the United States from Mexico, at a time and place not designated by immigration officials, near McAllen, Texas, in the Southern District of Texas. In late May, when agents showed Engineer-1 photographs of the individuals, Engineer-1 confirmed that these individuals had worked with him on relabeling jobs.

32. During an interview of the U.S. Logistics Company Representative on May 10, 2025, agents learned that 14 pallets that were due to be sent to New York Shipping Company were being stored at the U.S. Logistics Company's New Jersey warehouse ("New Jersey Warehouse"). An additional 26 pallets were on the way to the New Jersey Warehouse. Per communications from the PRC Logistics Company, the engineers planned to test and inspect all goods contained in the pallets before the U.S. Logistics Company shipped the pallets to the New York Warehouse. Specifically, two engineers were scheduled to inspect the pallets on May 12, 2025.

11

**2. GONG Hired "Engineers" to Relabel Nvidia GPUs**

33.  As noted in Paragraph 32, GPUs were scheduled to be "inspected" by "engineers" before being shipped to the New York Warehouse in May 2025.  During April 2025, **GONG** and other co-conspirators in the GPU smuggling scheme organized the critical step to hire and deploy engineers to relabel the goods in preparation for smuggling the GPUs from the United States.

34. Specifically, on April 2, 2025, **GONG** added Engineer-1 to a messaging application group chat, at approximately 1:13 am.  The group chat label translated to "stick labels in warehouses" (hereafter "Labels Group Chat").  Engineer-1 explained to agents that **GONG** added Engineer-1 to that group when **GONG** hired Engineer-1 to relabel Nvidia servers.  **GONG**'s username in the messaging application roughly translated to "[New York Technology Company] American region business and trade."

35. One minute after **GONG** added Engineer-1 to the Labels Group Chat, **GONG** asked "everyone" with no plans to "go stick labels … the day after tomorrow."  Group members then arranged to travel to the location and would "meet at Tom's place at 9am the day after tomorrow."

36. Unidentified user-1 ("UU-1") stated "Don't be late.  There's a lot that will take the whole day." When Unidentified user-2 ("UU-2")] asked whether it was located "same place as the last time," ["UU-1"] responded "No. Another warehouse in New Jersey" and posted an address in Secaucus, New Jersey.  The Secaucus address posted by UU-1 in the labels group chat was the same address where UC-1 observed Engineer-1 opening boxes and changing labels on May 12, 2025.

37. On April 3, 2025, a member in the label chat group posted a photograph below that showed what appears to be a Nvidia GPU baseboard, capable of housing eight Nvidia GPUs:



38. On April 29, 2025, at approximately 1:18 AM, **GONG** posted in the label group chat "continue sticking labels tomorrow" and posted the same warehouse address in Secaucus. **GONG** then stated that there would be 60 units after another member of the label group chat posted the photograph below. Based on the context, it appears that "units" referred to GPU baseboards.

| 序号 | 唛头（入仓号） | 件数 | 到仓日期 | 操作日期 |
|---|---|---|---|---|
| 1 | SD20250426-HY | 2板/10台 | 4.26 | 4.29 |
| 2 | SD20250428-XYT | 7板/50台 | 4.28 | 4.29 |

39. The photograph shows Chinese characters in the top row, and below: two shipments and their "shipping mark" numbers, the number of pallets/units, arrival date at the warehouse, and "work" date at the warehouse. The format of the number in the second column is the same as the numbers shown on the delivery order documents referenced in Paragraph 27 with "SD" as the prefix.

40. On April 29, 2025, at approximately 2:53 PM, an unidentified user with the username "4.32" asked for measurements of the size of a GPU. Another member of the group chat responded with the photo below showing a "SANDKYAN" label covering a Nvidia label, a measuring tape,

13

and drawings of two red boxes circling part of the measuring tape and a part of the Nvidia GPU displaying a barcode:



41. Approximately three minutes after the photograph was posted, "4.32" asked for additional measurements, including the barcode, stating "the purpose is to have two labels to cover these two parts: the barcode and NVIDIA trademark."

42. At approximately 8:50 pm on April 29, 2025, a group chat member stated, "finished with all 60." At approximately 2:55 pm on April 30, 2025, **GONG** instructed the group to update the "shipping mark" number to "SD20250425-SNC (3 pallets/30 units)" because "the phot[o] was incorrect."

43. On May 4, 2025, **GONG** stated in the label group chat that "there will be labeling next week for 26 commodities."

44. On May 7, 2025, a member in the label group chat posted the photograph below showing a baseboard with eight (8) "SANDKYAN" labels. The packaging of the baseboard appears to be identical with the packaging of a NVIDIA baseboard, a photograph of which was posted in the group chat on April 3, 2025:

14



45. On May 8, 2025, "4.32" posted that "the new labels say ADAPTER MODULE PN: 900-210100022 MADE IN CHINA. Check to see if we got it right." Later the same day, "4.32" posted that "go ask the warehouse. The client said they should still have some of the labels that were mailed previously."

46. On May 9, 2025, "4.32" stated in the label group chat that the labels have arrived and that they should ask the warehouse for "this delivery" and posted tracking information for the shipment below:

47. On May 11, 2025, **GONG** notified Engineer-1 and another member in the group chat that "tomorrow, go stick label at [address of the warehouse in Secaucus, NJ]. Meet at Eighth Avenue tomorrow and will drive." On May 12, 2025, "4.32" asked for "photograph feedback" once the job was done.

### 3. Agents Observed Mislabeled Nvidia GPUs with Fake Company Labels and Identified Shipping Records Showing False Information

48. On May 12, 2025, UC-1 went to U.S. Logistics Company's New Jersey Warehouse for approximately one hour. During that time, UC-1 observed two engineers, both appearing of

Chinese origin, unboxing and inspecting open boxes of Nvidia GPU baseboards. UC-1 spoke in Mandarin with one of the engineers (later identified as Engineer-1). During the conversation, UC-1 inquired about what Engineer-1 and his colleague were working on. Engineer-1 stated they were working to change the labels of the products, and that they needed to cover all the original Nvidia product labels. When UC-1 asked Engineer-1 why they needed to change the labels, Engineer-1 responded that it was for "export purposes." UC-1 remarked to Engineer-1 that he thought Engineer-1 and his colleague were engineers there to conduct testing on the products to make sure they were functional and without problems. Engineer-1 responded that the products had no problems. When UC-1 tried to engage Engineer-1 on what export problems he faced, Engineer-1 responded that they should not discuss what the problems were.

49. During his time in the New Jersey Warehouse, UC-1 observed both engineers removing Nvidia labels from the GPUs and replacing them with other labels with the name "SANDKYAN." The engineers carried pages of preprinted labels, including new barcodes and "SANDKYAN" product labels. The engineers placed these adhesive labels over existing Nvidia product codes.

50. Open-source searches of "SANDKYAN" did not reveal any results indicating such a brand or company bearing that name exists; thus, there is reason to believe that "SANDKYAN" is a fabricated brand used to obfuscate the fact that the GPUs – which were subject to U.S. export controls – were in fact Nvidia GPUs.

51. On May 13, 2025, "4.32" posted in the group chat that "5.13 work on these three orders below," specifying certain numbers, how each should be labeled and packaged, and posted labels— with the description "ADAPTER GROUP"—and two photographs below as references to where the labels should be applied:

16



65*22mm 数量：300张

覆盖中间那
种logo

40*20mm数量300

外箱的型号标签





52. On May 13, 2025, at approximately 3:06 pm, "4.32" provided feedback to the photograph below, stating "those eight small labels need to be applied too."



53. On May 13, 2025, at approximately 10:44 pm, **GONG** directed Engineer-1 and another member to "continue tomorrow."[4]

54. Also on May 13, 2025, while the above communications were being exchanged, UC-1 and another BIS agent returned to the New Jersey Warehouse. The agents observed the pallets the engineers had inspected during the previous day – all of which now contained "SANDKYAN" labels – and the newly delivered pallets. The anti-tampering tape on the boxes was taped over, and several new adhesive labels were placed on the outside, falsely describing the products as "Adapter Group." The new labels also listed the origin of the product as "Made in Taiwan," with new product numbers, carton ID, serial numbers, and QR codes. Agents also observed additional product labels with descriptions of "Adapter Group," fictitious model numbers, and stickers bearing the "SANDKYAN" brand name.

55. Based on my training and experience, hiding the origin and type of the goods using false information is a common tactic to allow for falsified EEI or to evade export controls by avoiding potential inspections when goods are shipped outside the United States.

56. The newly delivered pallets also included servers that contained Nvidia HGX A100 GPU baseboards. Except for one invoice and two bills of lading, there was no other physical paperwork in the warehouse showing where the products came from. The invoice, which was recovered from a single pallet, showed an Australian company as the purchaser of 100 Nvidia H200 GPUs from a U.S. supplier and Australia as the ultimate destination. Both bills of lading, which were recovered from discarded packaging materials, showed a Massachusetts company that

---

[4] On May 13, BIS detained the equipment and moved the goods to a government-controlled warehouse. It is unclear when **GONG** became aware about the GPUs being moved to another location.

is a retailer of Nvidia GPUs in Southborough, Massachusetts ("Massachusetts Company-1") as seller, with shipment to the New Jersey Warehouse.

57. To prevent the illegal export of these goods, agents detained and removed all the GPUs from the warehouse.  In total, the agents recovered more than $30 million worth of export-controlled GPUs and other items from the New Jersey Warehouse.

**4. Shipping and Export Records Indicated the Export of GPUs Included False Information**

58. According to AES records for New York Shipping Company, New York Shipping Company began filing EEI with commodity descriptions including "adapter group," "adapter module," and "adapter board" (matching the false labels described above) in March 2025.  These filings continued from March 12, 2025 through at least May 13, 2025 (when agents detained the shipment of GPUs described above).  The shipments were filed "no license required" with an ultimate destination of an air freight facility near the Toronto International Airport in Canada.  The ECCN field for all these export filings was left blank.  Based on my training and experience, I know that leaving the ECCN field blank is a tactic used to conceal the true nature of the shipment and is an indication that the products may be diverted to other countries contrary to U.S. laws.

59. On May 16, 2025, agents spoke with employees of the New York Shipping Company at its offices.  The employees informed agents that they recently had several exports to Canada.  The contents of the exports were described as "adapters," and the shipments were directed by an individual based in Hong Kong.  A review of EEI filings for the Canada exports listed a company with a Colorado address ("Colorado Company-1") as the U.S. Principal Party of Interest ("USPPI") with an individual listed as the company agent.  The point of contact for the company and the name on shipping documents, however, was Co-conspirator -1, an employee of Shenzhen Technology Company.  When agents visited the address, they discovered it was a co-working space

and no individuals at the space knew of Colorado Company-1.  Agents did not identify a valid bank account or business activity for the Colorado Company.

60. Agents also reviewed the bills of lading tied to exports handled by the New York Shipping Company during the five-day period between March 11 and March 16, 2025.  Agents discovered a bill of lading for three pallets of "adapter groups" with the intermediate and ultimate consignee listed as Hong Kong Logistics Company.  A review of the shipper's letter of instruction and invoices indicated that the shipment included 23 pieces of "Sandkyan Adapter Group," with an invoice in which Colorado Company-1 had sold the items to Hong Kong Logistics Company.  Based on the items being falsely described in the same manner as Houston Company-1's purchases and exports of GPUs, agents believe this was a shipment of Nvidia Tensor Core GPUs that was unlawfully exported to Hong Kong.

### 5. Messaging Group Chat After Detention of GPUs Included GONG and Referred to Hong Kong Logistics Company as "Client"

61. Three days after BIS detained the GPUs and other equipment, on May 16, 2025 at approximately 3:47 pm, "4.32" asked Engineer-1 to add him/her on the messaging application and that "4.32" would add Engineer-1 to the "client group chat".

62. Approximately one minute later, on May 16, 2025 at 3:48 pm, Engineer-1 was added to group chat "[外部]福运-纽约设备改签服务" which translates to "[External][Hong Kong Logistics Company] - New York Equipment Label Changing Service" (hereafter "HKLC group chat").  **GONG** was also a member of this group.

63. A review of the HKLC Group Chat revealed that multiple group members asked Engineer-1 about what happened at the warehouse, demanding videochat to show the conditions at the warehouse, requesting Engineer-1 to ask questions with the warehouse about who ordered

the removal of equipment, whether there was any surveillance footage, any chat history or call history, and to ask the warehouse for license plate information, driver information, and logistic company information of the vehicle(s) that removed the servers. Engineer-1 did not know if the servers were ever found.

## **CONCLUSION**

64. Based on my training and experience, and further supported by the facts in this affidavit, I submit that there is probable cause to believe that **Fanyue GONG**, aka "**Tom**," had committed Conspiracy in violation of 18 U.S.C § 371 and Smuggling of Goods from the United States, in violation of 18 U.S.C.§ 554.

Respectfully submitted,

_____
Christopher O'Neill, Special Agent
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement

Subscribed and sworn to before me telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 2nd day of December 2025, and I find probable cause.

_____
Hon. Christina A. Bryan
United States Magistrate Judge

# EXHIBIT C

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*September 30, 2025*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**UNITED STATES OF AMERICA**

v.

**HAO GLOBAL LLC** and
**ALAN HAO HSU**
   a.k.a. **HAOCHUN HSU**

**Criminal No.**        **4:25-cr-510**

**Filed Under Seal**

## INFORMATION

**THE UNITED STATES ATTORNEY CHARGES THAT:**

## BACKGROUND

The GPU Smuggling Scheme

1.      Since at least October 2024 and continuing through, in or about, May 2025, the

defendant, **ALAN HAO HSU**, a/k/a/ **HAOCHUN HSU**, and other individuals, utilizing **HSU**'s

company, defendant **HAO GLOBAL LLC**, knowingly exported and attempted to export at least

$160 million worth of export-controlled Nvidia H100 and H200 Tensor Core Graphic Processing

Units ("GPUs"), which are high-speed GPUs used for artificial intelligence ("AI") applications

and high-performance computing ("HPC"), outside the United States in violation of U.S. laws.

Specifically, Nvidia H100 and H200 Tensor Core GPUs are designed to process massive amounts

of data, advancing generative AI and large language models and accelerating scientific computing

for HPC workloads. Those GPUs were ultimately exported to the People's Republic of China

("PRC"), Hong Kong, and other destinations.

2.      Through the relevant time of this Information, PRC-based individuals would

provide a business lead to **HSU** about a potential customer seeking GPUs. Using shell companies

and layers of financial transactions, **HSU** and co-conspirators received funds from the PRC; purchased high-powered GPUs through **HAO GLOBAL** for customers seemingly within the United States, Thailand, and Malaysia; and then facilitated the export of those GPUs out of the United States, to countries including Thailand and Taiwan. Ultimately, the GPUs were diverted to China and Hong Kong, including by transshipping through third countries.

3.      As part of the illicit scheme, bills of lading were falsified – misclassifying the GPUs for export to obfuscate the true nature of the goods and falsifying the ultimate consignee to hide the GPUs ultimate destination.  The source of the funds was also obscured – funds from accounts in the PRC would be deposited into bank accounts in Thailand, Singapore, and Malaysia, which were then deposited into bank accounts in the United States for use in purchasing the GPUs.

Individuals and Companies

4.      Defendant **ALAN HAO HSU**, also known as **HAOCHUN HSU**, was a naturalized U.S. citizen who resided in Fort Bend County, Texas.  In November 2014, **HSU** founded defendant **HAO GLOBAL LLC**, a company registered with the Texas State Comptroller and based in Sugar Land, Texas.  From then until October 2024, **HAO GLOBAL** was a dormant corporate entity, with no known sales or business activity.

5.      Starting in October 2024, **HSU**, and other individuals, utilizing **HAO GLOBAL**, began purchasing Nvidia HGX GPU baseboards from a Hong Kong-based global technology company with headquarters in Morrisville, North Carolina ("Global Technology Company-1"). Each Nvidia HGX GPU baseboard contained eight Nvidia H100 or H200 Tensor Core GPUs. The Nvidia H100 Tensor Core GPU was a ninth-generation data center GPU designed to deliver an order-of-magnitude performance leap for large-scale AI and HPC.  The Nvidia H200 Tensor Core GPU, building upon the H100, was the world's most advanced chip ever built, designed to power

2

generative AI and HPC applications by processing vast amounts of data at high speed. Both Nvidia Tensor Core GPUs appeared on the Commerce Control List ("CCL") under Export Control Classification Number ("ECCN") 4A090.a, requiring a license for export to the PRC or Hong Kong.

6.    During the relevant period, **HSU** and Global Technology Company-1 agreed to **HAO GLOBAL**'s purchase of 3,872 H100 and 3,160 H200 Tensor Core GPUs, with a total purchase price of $160,815,000. The purchase was divided into multiple transactions and shipments. During that period, **HSU** wire transferred $53,079,000 to Global Technology Company-1 as payment for the export-controlled GPUs. **HAO GLOBAL** received those funds from various other entities, including companies based in Thailand, Singapore, Malaysia, and the PRC. In exchange for this payment, Global Technology Company-1 agreed to initially ship 480 H100 and 1,552 H200 Tensor Core GPUs.

7.    Although, the "Ship To" address provided to Global Technology Company-1 was a retail-style strip center in Houston, Texas, **HSU** requested the GPUs be collected at a distribution center in Whitsett, North Carolina. The information provided or reviewed by **HSU** on the Shipper's Letters of Instruction and Bills of Lading was incomplete or incorrect; for example the GPUs were misclassified as other non-CCL listed electronics merchandise. **HSU** arranged for the misclassified GPUs to be exported from the United States to end users in Thailand and Taiwan. Shipping records show that GPUs purchased by **HAO GLOBAL** were ultimately exported to the PRC, including by transshipping through Singapore and Malaysia.

<u>Legal Background</u>
*Export and Shipping Records*

8.    The U.S. Department of Commerce reviews and controls the export of certain items, including commodities, software, and technologies, from the United States to foreign countries

through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774. In particular, the EAR impose licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or re-exported lawfully from one foreign destination to another. The most sensitive items subject to EAR control are identified on the CCL, published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by an ECCN based on their technical characteristics. Each ECCN has export control requirements depending on the destination, end user, and end use.

9.  Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

10.  The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. An EEI also is required, regardless of the value of the goods, if the goods require an export license. 15 C.F.R. §§ 758.1 and 30.2.

11.  A material part of the EEI and AES, as well as other export filings, is information concerning the end user and ultimate destination of the export. The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

4

*Unlawful Export Information*

12.     Title 13, United States Code, Section 305, makes it a federal crime to knowingly fail to file or to knowingly submit false or misleading export information through the SED, EEI, or the AES, or to otherwise use the SED or the AES to further any illegal activity.  Section 305 permits forfeiture penalties for any person who is convicted under this section, and such persons are subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

*Smuggling*

13.     Title 18, United States Code, Section 554, states, "Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States" shall be fined, imprisoned not more than 10 years, or both.

**COUNT ONE**
S̲MUGGLING G̲OODS FROM THE U̲NITED S̲TATES; A̲IDING AND A̲BETTING
(18 U.S.C. §§ 554 and 2)

14.     In or about and between October 2024 and May 2025, in the Southern District of Texas and elsewhere, the defendants,

**HAO GLOBAL LLC** and **ALAN HAO HSU,**

and other entities and persons, each aiding, abetting, and assisting one another, received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of Nvidia H100 and H200 Graphics Processing Units prior to exportation, knowing them to be intended for

5

exportation contrary to Title 13, United States Code, Section 305, and 15 C.F.R. Parts 30 and 730-774 (Export Administration Regulations), laws and regulations of the United States.

15.     All in violation of Title 18, United States Code, Sections 554(a) and 2.

## COUNT TWO
### Unlawful Export Information; Aiding and Abetting
(13 U.S.C. § 305; 18 U.S.C. § 2)

16.     In or about and between October 2024 and May 2025, in the Southern District of Texas and elsewhere, the defendants,

**HAO GLOBAL LLC** and **ALAN HAO HSU,**

and other entities and persons, each aiding, abetting, and assisting one another, did knowingly cause the submission of false and misleading export information through Shipper's Export Declarations and the Automated Export System, by falsely declaring the contents of shipments to be EAR99 (i.e., subject to the Export Administration Regulations but not specified on the Commerce Control List), when, in fact, the defendants knew the shipments contained Nvidia H100 and H200 Tensor Core GPUs, which appeared on the Commerce Control List under Export Control Classification Number 4A090.a.

17.     All in violation of Title 13, United States Code, Section 305, and Title 18, United States Code, Section 2.

## NOTICE OF CRIMINAL FORFEITURE
(18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 13 U.S.C. § 305)

18.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), the United States gives notice that upon a defendant's conviction of Count One, all property, real or personal, which constitutes or is derived, directly or indirectly, from proceeds traceable to such offense, is subject to forfeiture.

19.     Pursuant to Title 13, United States Code, Section 305, the United States gives notice

that upon a defendant's conviction of Count Two, any of that defendant's interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation; any of that defendant's interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the violation; and/or any of that defendant's property constituting, or derived from, any proceeds obtained directly or indirectly as a result of the violation is subject to forfeiture.

### Property Subject to Forfeiture

20.     The property subject to forfeiture includes, but is not limited to, the following property:

  a. Approximately $5,885,000 in funds held in a financial account at Bank of America;

  b. Approximately 58 pallets of an assorted variety of A100, H100, and H200 Tensor Core GPU baseboard modules; and

  c. Approximately 32 H200 Tensor Core GPU baseboard modules.

### Money Judgment and Substitute Assets

21.     The United States gives notice that it will seek a money judgment against each defendant. If any of the property described above, as a result of any act or omission of the defendant:

  a.     cannot be located upon the exercise of due diligence;

  b.     has been transferred or sold to, or deposited with, a third party;

  c.     has been placed beyond the jurisdiction of the court;

  d.     has been substantially diminished in value; or

7

     e.     has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the amount

of the money judgment pursuant to Title 21, United States Code, Section 853(p).


**NICHOLAS J. GANJEI**
**UNITED STATES ATTORNEY**

BY: _____
JOHN MARCK
ASSISTANT U.S. ATTORNEY


_____
S. MARK MCINTYRE
ASSISTANT U.S. ATTORNEY



**JOHN A. EISENBERG**
**ASSISTANT ATTORNEY GENERAL**
**NATIONAL SECURITY DIVISION**



BY: _____
FATEMA MERCHANT
YIFEI ZHENG
TRIAL ATTORNEYS

8

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 4:25-cr-00510 |
| | § | |
| ALAN HAO HSU, | § | |
| a.k.a. HAOCHUN HSU | § | **FILED UNDER SEAL** |
| | § | |

## PLEA AGREEMENT

The United States of America, by and through Nicholas J. Ganjei, United States Attorney

for the Southern District of Texas, John Marck and S. Mark McIntyre, Assistant United States

Attorneys, National Security Division, Counterintelligence and Export Control Section Trial

Attorneys Yifei Zheng and Fatema Merchant, the defendant, **ALAN HAO HSU**, a/k/a

**HAOCHUN HSU** ("Defendant"), and Defendant's counsel, pursuant to Rule 11(c)(1)(A) and (B)

of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the

terms and conditions of which are as follows:

### Defendant's Agreement

1.   Defendant agrees to plead guilty to Counts One and Two of the Information. Count

One charges Defendant with Smuggling, in violation of Title 18, United States Code, Sections

554(a) and 2. Count Two charges Defendant with Unlawful Export Activities, in violation of Title

13, United States Code, Section 305, and Title 18, United States Code, Section 2.   Defendant, by

entering this plea, agrees that he is waiving any right to have the facts that the law makes essential

to the punishment either charged in the Information, or proved to a jury or proven beyond a

reasonable doubt.

### Punishment Range

2.  The **statutory** maximum penalty for violating Count One: Title 18, United States Code, Sections 554(a) and 2, is imprisonment of not more than ten years and a fine of not more than $250,000 or twice the gross gain or loss from the offense. Additionally, Defendant may receive a term of supervised release after imprisonment of not more than three years. The **statutory** maximum penalty for violating Count Two: Title 13, United States Code, Section 305, and Title 18, United States Code, Section 2, is imprisonment of not more than five years or a fine not to exceed $10,000 per violation, or both. Additionally, Defendant may receive a term of supervised release after imprisonment of not more than one year. *See* Title 18, United States Code, Sections 3559(a)(4) and 3583(b)(2). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for not more than two years, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United States Code, Sections 3559(a)(4) and 3583(e)(3). Defendant understands that the sentences on multiple counts may be imposed to run consecutively to one another or to any other sentence. Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

### Mandatory Special Assessment

3.  Pursuant to Title 18, United States Code, Section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

2

### Immigration Consequences

4.    Defendant recognizes that pleading guilty may have consequences with respect to his immigration status. Defendant understands that if he is a naturalized United States citizen, pleading guilty may result in immigration consequences, such as denaturalization and potential deportation or removal from the United States. Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty, and Defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction.

### Cooperation

5.    The parties understand this agreement carries the potential for a motion for departure under Section 5K1.1 of the Sentencing Guidelines. Defendant understands and agrees that whether such a motion is filed will be determined solely by the United States through the United States Attorney for the Southern District of Texas. Should Defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines. Defendant further agrees to persist in that plea through sentencing, fully cooperate with the United States, and not oppose the forfeiture of assets contemplated in paragraph 20 of this agreement. Defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

6.    Defendant understands and agrees that "fully cooperate," as that term is used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to activity related to violations of U.S. export controls and sanctions. Defendant

3

understands that such information includes both state and federal offenses arising therefrom. In that regard:

(a)    Defendant agrees that this plea agreement binds only the United States Attorney for the Southern District of Texas, the National Security Division's Counterintelligence and Export Control Section, and Defendant; it does not bind any other United States Attorney or any other component of the Department of Justice;

(b)    Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States. Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement. Such waiver does not affect the protections set out in U.S.S.G. § 1B1.8 and the proffer agreement in this case;

(c)    Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d)    Defendant agrees to provide truthful, complete, and accurate information and testimony and understands any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

(e)    Defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation; and

(f)    Should the recommended departure, if any, not meet Defendant's expectations, Defendant understands that he remains bound by the terms of this agreement and cannot, for that reason alone, withdraw his plea.

### Waiver of Appeal, Collateral Review, and Statute of Limitations

7.    Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, Section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or

4

"collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, Section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

8.  Defendant also agrees that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

9.  In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005).

Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

10.    Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

### The United States' Agreements

11.    If the Court determines that Defendant qualifies for an adjustment under U.S.S.G. § 3E1.1(a), and the offense level prior to operation of § 3E1.1(a) is 16 or greater, the United States will move under § 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of his or her intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently.

12.    The United States Attorney's Office for the Southern District of Texas and the Counterintelligence and Export Control Section of National Security Division of the Department of Justice agree that they will not further criminally prosecute Defendant for the specific conduct described in the Information. This plea agreement binds only the United States Attorney's Office for the Southern District of Texas, the Counterintelligence and Export Control Section of National Security Division of the Justice Department, and Defendant. It does not bind any other United States Attorney's Office. The United States Attorney's Office for the Southern District of Texas and the Counterintelligence and Export Control Section of the National Security Division will

6

bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

### United States' Non-Waiver of Appeal

13. The United States reserves the right to carry out its responsibilities under guidelines sentencing. Specifically, the United States reserves the right:

> (a) to bring the facts of this case, including evidence in the files of the United States Attorney's Office for the Southern District of Texas or the files of any investigative agency, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

> (b) to set forth or dispute sentencing factors or facts material to sentencing;

> (c) to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

> (d) to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, Section 3553(a); and

> (e) to appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination

14. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offenses to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence

7

up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

15.    Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a)    If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree.

(b)    At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court; and

(c)    At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if Defendant desired to do so, he could testify on his own behalf.

### Factual Basis for Guilty Plea

16.    Defendant is pleading guilty because he is in fact guilty of the charges contained in Counts One and Two of the Information. Defendant admits and agrees that, if this case were to proceed to trial, the United States could prove each element of the offenses beyond a reasonable doubt, including the following facts, which among others would be offered to establish Defendant's guilt:

8

### THE GPU SMUGGLING SCHEME

Since at least October 2024 and continuing through, in or about, May 2025, the defendant, **ALAN HAO HSU**, a/k/a/ **HAOCHUN HSU**, and other individuals, utilizing **HSU**'s company, **HAO GLOBAL LLC**, knowingly exported and attempted to export at least $160 million worth of export-controlled Nvidia H100 and H200 Tensor Core Graphic Processing Units ("GPUs"), which are high-speed GPUs used for artificial intelligence ("AI") applications and high-performance computing ("HPC"), outside the United States in violation of U.S. laws. Specifically, Nvidia H100 and H200 Tensor Core GPUs are designed to process massive amounts of data, advancing generative AI and large language models and accelerating scientific computing for HPC workloads. Those GPUs were ultimately exported to the People's Republic of China ("PRC"), Hong Kong, and other destinations, in violation of U.S. export laws.

Through the relevant time of this Information, PRC-based individuals would provide a business lead to HSU about a potential customer seeking GPUs. Using shell companies and layers of financial transactions, HSU and co-conspirators received funds from the PRC; purchased high-powered GPUs through HAO GLOBAL for customers seemingly within the United States, Thailand, and Malaysia; and then facilitated the export of those GPUs out of the United States to countries including Thailand and Taiwan.   Ultimately, the GPUs were diverted to China and Hong Kong, including by transshipping through third countries.

As part of the illicit scheme, bills of lading were falsified – misclassifying the GPUs for export to obfuscate the true nature of the goods and falsifying the ultimate consignee to hide the GPUs ultimate destination.   The source of the funds was also obscured – funds from accounts in

9

the PRC would be deposited into bank accounts in Thailand, Singapore, and Malaysia, which were then deposited into bank accounts in the United States for use in purchasing the GPUs.

## INTRODUCTION

Defendant **ALAN HAO HSU**, also known as **HAOCHUN HSU**, was a naturalized U.S. citizen who resided in Fort Bend County, Texas. In November 2014, **HSU** founded defendant **HAO GLOBAL LLC**, a company registered with the Texas State Comptroller and based in Sugar Land, Texas. From then until October 2024, **HAO GLOBAL** was a dormant corporate entity, with no known sales or business activity.

Starting in October 2024, **HSU**, and other individuals, utilizing **HAO GLOBAL**, began purchasing Nvidia HGX GPU baseboards from a Hong Kong-based global technology company with headquarters in Morrisville, North Carolina ("Global Technology Company-1"). Each Nvidia HGX GPU baseboard contained eight Nvidia H100 or H200 Tensor Core GPUs. The Nvidia H100 Tensor Core GPU was a ninth-generation data center GPU designed to deliver an order-of-magnitude performance leap for large-scale AI and HPC. The Nvidia H200 Tensor Core GPU, building upon the H100, was the world's most advanced chip ever built, designed to power generative AI and HPC applications by processing vast amounts of data at high speed. As further discussed herein, both Nvidia Tensor Core GPUs appeared on the Commerce Control List ("CCL") under Export Control Classification Number ("ECCN") 4A090.a, requiring a license for export to the PRC or Hong Kong.

During the relevant period, **HSU** and Global Technology Company-1 agreed to **HAO GLOBAL**'s purchase of 3,872 H100 and 3,160 H200 Tensor Core GPUs, with a total purchase price of $160,815,000. The purchase was divided into multiple transactions and shipments.

During that period, **HSU** wire transferred $53,079,000 to Global Technology Company-1 as payment for the export-controlled GPUs. **HAO GLOBAL** received those funds from various other entities, including companies based in Thailand, Singapore, Malaysia, and the PRC.

In exchange for this payment, Global Technology Company-1 agreed to initially ship 480 H100 and 1,552 H200 Tensor Core GPUs.

Although, the "Ship To" address provided to Global Technology Company-1 was a retail-style strip center in Houston, Texas, **HSU** requested the GPUs be collected at a distribution center in Whitsett, North Carolina. The information provided or reviewed by **HSU** on the Shipper's Letters of Instruction and Bills of Lading was incomplete or incorrect for example, the GPUs were misclassified as other non-CCL listed electronics merchandise. Shipping records show that GPUs purchased by **HAO GLOBAL** were ultimately exported to the PRC, including by transshipping through Singapore and Malaysia.

### GPU TRANSACTION #1

On October 1, 2024, **HSU** received an email to his **HAO GLOBAL** email address from a business leader with Global Technology Company-1. The business leader inquired about **HSU**'s interest in purchasing Nvidia H100 Tensor Core GPUs directly from Global Technology Company-1. Shortly thereafter, **HSU** and Global Technology Company-1 began negotiations for **HAO GLOBAL** to purchase Nvidia HGX GPU baseboards, each containing eight Nvidia Tensor Core GPUs. During these negotiations, **HSU** provided Global Technology Company-1 with an end user certification stating that the only "Ship-To" country was "USA."

On October 10, 2024, **HSU** forwarded **HAO GLOBAL**'s compliance procedures to Global Technology Company-1, acknowledging and "emphasizing that any products subject to U.S.

11

regulations must remain in the U.S. unless proper export licenses are obtained." On the same day, Global Technology Company-1 forwarded **HSU** an agreed purchase order for 384 Nvidia H100 HGX GPU baseboards, for a total purchase price of $69,120,000. A week later, **HSU** and Global Technology Company-1 agreed to break the purchase into three separate transactions: 60 baseboards for $10.8 million; 150 baseboards for $27 million; and 174 baseboards for $31.32 million.

On or about October 22, 2024, **HSU** agreed to pay an $800,000 non-refundable deposit to be followed by the remaining $10 million. The next day, **HAO GLOBAL** received a wire transfer of $655,000 from AGL Supply Chain, a subsidiary of Rogan Tech Co., a China-based technology company. Later the same day, **HAO GLOBAL** wired $650,000 to Global Technology Company-1. On October 24, 2024, **HSU** wrote a check for $143,000 from AGL Supply Chain and used those funds to open a **HAO GLOBAL** bank account. **HSU** deposited an additional $10,000 cash into that account. The following day, October 25, 2024, **HSU** wired $150,000 out of **HAO GLOBAL**'s account to Global Technology Company-1.

Between October 26, 2024, and November 21, 2024, **HAO GLOBAL** received transfers totaling $12,600,000 into its account from California Company-1, whose funds originated from Chinese Company-1, a Shenzhen, China-based company that holds patents on artificial intelligence. During that same period, **HSU** made three payments to Global Technology Company-1, totaling $10,000,000. **HSU** then wired $1,470,000 for a "Consulting Fee" to Yu Fan Electronics Co., a Hong Kong-based subsidiary of a Chinese technology company. **HSU** also wired $800,000 back to AGL Supply Chain.

On November 12, 2024, **HSU** traveled from Houston, Texas, to Global Technology Company-1's distribution center in Whitsett, North Carolina, to personally inspect the order of GPUs.   After the inspection, on November 18, 2024, **HSU** contacted Global Technology Company-1 and introduced the business development director of International Logistics Company-1, as **HAO GLOBAL**'s contact person for the shipment.   Over the next nine days, **HSU** negotiated and arranged for the shipment of the GPUs to be collected from Global Technology Company-1 and shipped to International Logistics Company-1 in New York. On or about November 21, 2024, after **HSU** and the business development director arranged for International Logistics Company-1 to take delivery of the GPUs in North Carolina, **HSU** forwarded a bill of lading which mischaracterized the GPUs as "Computer Servers."

On November 22, 2024, the shipment of GPUs was picked up, and transported to International Logistics Company-1 in New York.   The following day, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 60 H100 GPU baseboards at a price of $180,000 each for a total of $10,800,000.   The invoice warned that the GPU baseboards were export-controlled by the U.S. Government and authorized only to the country of ultimate destination herein identified.   The "Ship To" address provided to Global Technology Company-1 was a retail-style strip center in Houston, Texas.   The "Invoice To" address provided to Global Technology Company-1 was a vacant suite in a corporate office building in Sugar Land, Texas.

On November 25, 2024, the GPUs were shipped from New York to Singapore via an air freight carrier.   Two days later, the GPUs were transshipped from Singapore to Hong Kong, PRC, via the same carrier.   On or about November 28, 2024, the GPUs arrived in Hong Kong, PRC, without a legally required export license from the U.S. Department of Commerce.   Additionally,

13

the Electronic Export Information ("EEI") filing attributed to this order misclassified the items as EAR99, falsely identifying the export control classification of the GPUs.

Records from International Logistics Company-1 show the shipment was insured from initial collection in Whitsett, North Carolina, until final delivery in Hong Kong, PRC, by Chinese Company-1.

### GPU TRANSACTION #2 (PART 1)

While the GPUs from Transaction #1 were still en route to Hong Kong, **HSU** began arranging for the purchase of additional GPUs from Global Technology Company-1. On January 14, 2025, **HSU** emailed Global Technology Company-1 an end-use certification for a second transaction in which **HSU** claimed the end user was Thailand Company-1, a Thailand-based artificial intelligence provider.

On January 15, 2025, **HAO GLOBAL** received a wire transfer of $1,500,000 to its account from Chinese Company-2, a Hong Kong-based internet data center ("IDC") construction service provider. Around that same time, Chinese Company-2 sent **HSU** an invoice for $1,500,000. Two days later, Global Technology Company-1 forwarded **HSU** an agreed purchase order for 300 baseboards, which contained 800 H100 GPUs and 1,600 H200 GPUs, with a total purchase price of $55,620,000. **HSU** and Global Technology Company-1 agreed to break the purchase into three separate transactions: 30 baseboards; 170 baseboards; and 110 baseboards. Immediately thereafter, **HSU** paid a deposit of $1,500,000 to Global Technology Company-1. **HSU** and Global Technology Company-1 further discussed internal shipping and logistics for the order of GPUs.

14

On February 12, 2025, **HAO GLOBAL** received a wire transfer of $180,000 from Rogan Tech Co.  Later that same week, **HAO GLOBAL** received a wire transfer of $6,240,000 from Thailand Company-1.

On February 18, 2025, **HSU** made a payment of $5,718,000 to Global Technology Company-1 and arranged for 30 Nvidia H200 baseboards to be picked up at Global Technology Company-1 in North Carolina.   Early the next day, **HSU** contacted a logistics company to arrange for the shipment of GPUs.   **HSU** then made an additional payment of $381,200 to Global Technology Company-1 and added an additional two baseboards to the order, bringing the total to 32 H200 baseboards.   **HSU** also arranged for the future purchase of an additional 58 Nvidia H200 baseboards to be picked up from Global Technology Company-1 at an undetermined date. **HSU** also provided a completed shipper's letter of instruction to the logistics company, in which he provided no consignee contact information, no ECCN information, and an incorrect description of commodities.

On February 21, 2025, the shipment of 32 H200 GPU baseboards was picked up from Global Technology Company-1 and transported to a logistics company warehouse in Atlanta, Georgia.   On the same day, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 32 H200 GPU baseboards at a price of $190,600 each for a total of $6,099,200.

On February 24, 2025, agents from the U.S. Department of Commerce, Bureau of Industry and Security, detained the shipment of GPU baseboards in Atlanta based on the incorrect and misclassified shipping information.

### GPU TRANSACTION #2 (PART 2)

On February 20, 2025, Chinese Company-2 wired $2,880,000 to Thailand Company-1. On February 24, 2025, Thailand Company-1 wired $6,240,000 to **HAO GLOBAL**. That same day, **HSU** arranged for the 58 Nvidia H200 GPU baseboards to be picked up from Global Technology Company-1 in Whitsett, North Carolina.

On February 25, 2025, **HSU** made a payment of $11,054,800 from **HAO GLOBAL** to Global Technology Company-1. On that same day, Chinese Company-2 wire transferred $6,720,000 to Thailand Company-1. On February 26, 2025, Thailand Company-1 wire transferred $6,240,000 to **HAO GLOBAL**. On February 27, 2025, Global Technology Company-1 notified **HSU** that the 58 Nvidia H200 GPU baseboards were available for pick up in Whitsett, North Carolina.

On February 27, 2025, **HSU** wire transferred $450,000 from **HAO GLOBAL** to the Hong Kong-based bank account of Yu Fan Electronics Co. Limited for a "March 2025 Consulting Fee." That same day, **HSU** wire transferred an additional $450,000 from **HAO GLOBAL** the Hong Kong-based bank account of Yu Fan Electronics Co. Limited for a "February 2025 Consulting Fee."

On February 28, 2025, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 58 H200 GPU baseboards at a price of $190,600 each for a total of $11,054,800. The invoice warned that the GPU baseboards were export controlled by the U.S. Government and authorized only to the country of ultimate destination herein identified. The "Ship To" address was a retail-style strip center in Houston, Texas. The "Invoice To" address provided was a vacant office suite in in Sugar Land, Texas.

On March 3, 2025, **HSU** wire transferred an additional $450,000 from **HAO GLOBAL** to the Hong Kong-based bank account of Yu Fan Electronics Co. Limited for a "January 2025 Consulting Fee."

On March 4, 2024, Global Technology Company-1 inquired about the timeline for **HSU**'s collection of the GPU baseboards. In response, **HSU** notified Global Technology Company-1 that the delay in pickup was the result of the freight forwarder encountering unexpected issues with the previous shipment of 32 GPU baseboards, and they were still working on finding a new freight forwarder. . On March 6, 2025, **HSU** arranged for Chinese Freight Forwarder-1, a China-based global logistics company, to collect the 58 GPU baseboards from Global Technology Company-1 in Whitsett, North Carolina.

On March 10, 2025, the shipment of 58 H200 GPU baseboards were picked up at Global Technology Company-1 in Whitsett, North Carolina, and transported to a warehouse in New Jersey, owned by a logistics business that only interacts with China-based customers and brokers. The bill of lading for the transportation, which was forwarded to **HSU**, misclassified the "Item Description" as "ADAPTER MODULE / ADAPTER CARD" with a weight of 1,414 pounds.

On March 14, 2025, a shipment of items described as ADAPTER MODULE with a weight of approximately 1,400 pounds was exported from Canada to Hong Kong, China. The exporter was listed as Chinese Company-2.

### GPU TRANSACTION #3

On February 23, 2025, Global Technology Company-1 forwarded **HSU** an agreed purchase order for 195 Nvidia H200 Tensor Core GPU baseboards with a total purchase price $36,075,000.

17

On February 24, 2025, Chinese Company-2 made two wire transfers from a Hong Kong-based bank account, $5,000,000 and $5,800,000, to Taiwan Company-1, a Taiwan-based GPU Server business.   That same day, **HAO GLOBAL** received a wire transfer of $6,815,982 from Taiwan Company-1.   On February 25, 2025, **HAO GLOBAL** received an additional wire transfer of $3,833,982 from Taiwan Company-1.

On February 26, 2025, Chinese Company-2 made two wire transfers from a Hong Kong-based bank account, $8,420,000 and $7,780,000, to Taiwan Company-1.   Later that same day, **HAO GLOBAL** received a wire transfer of $6,815,982 from Taiwan Company-1. On February 27, 2025, **HAO GLOBAL** received a wire transfer of $9,158,982 from Taiwan Company-1. On that same day, **HSU** made a payment of $500,000 from **HAO GLOBAL**'s account to Global Technology Company-1.

On March 12, 2025, **HSU** and Global Technology Company-1 agreed to break the purchase into multiple transactions, the first of which was for 104 H200 GPU baseboards.   On March 13, 2025, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 104 H200 GPU baseboards at a price of $185,000 each for a total of $19,240,000.   The invoice warned that the GPU baseboards were export-controlled by the U.S. Government and authorized only to the country of ultimate destination herein identified.   The "Ship To" address was a retail-style strip center in Houston, Texas.   The "Invoice To" address provided was a vacant office suite in in Sugar Land, Texas.

On or about March 14, 2025, the shipment of 104 H200 GPU baseboards was picked up at Global Technology Company-1 in Whitsett, North Carolina, and transported to a warehouse in New York, which deals primarily with China-based customers and brokers.   The freight forwarder

18

that transported the shipment was Chinese Freight Forwarder-1.   The bill of lading for the transportation, which was forwarded to **HSU**, misclassified the "Item Description" as "ADAPTER MODULE / ADAPTER CARD" with a weight of 2,522 kilograms.   On or about March 15, 2025, the shipment of 104 H200 GPUs arrived in New York.   The Government has reason to believe and evidence to support that the shipment, similar to the March 14, 2025 shipment, was exported from Canada to Hong Kong by Chinese Company-2.

On or about March 19, 2025, **HSU** transferred $621,500 from the **HAO GLOBAL** account to Great Disposal Limited, a Hong Kong-based subsidiary of Yu Fan Electronics Co. Limited, for a "Consulting Fee."   On or about March 24, 2025, **HSU** wire transferred $728,500 from the **HAO GLOBAL** account to Great Disposal Limited for a "Consulting Fee."

Therefore, **ALAN HAO HSU**, a/k/a **HAOCHUN HSU**, admits and confesses that in or about and between October 2024 and May 2025, in the Southern District of Texas and elsewhere, he received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of Nvidia H100 and H200 Graphics Processing Units prior to exportation to Thailand and Taiwan, knowing them to be intended for exportation contrary to laws and regulations of the United States, and knowingly causing the submission of false and misleading export information through Shipper's Export Declarations and the Automated Export System.

### Breach of Plea Agreement

17.   If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, including required financial

information, or if Defendant knowingly withholds evidence or is otherwise not completely truthful

with the United States, then the United States may move the Court to set aside the guilty plea and

reinstate prosecution. Any information and documents that have been disclosed by Defendant,

whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used

against Defendant in any prosecution.

### Monetary Penalties, Assets, and Financial Disclosures

14.    Defendant understands and agrees that monetary penalties will be subject to

immediate enforcement as provided in 18 U.S.C. § 3613 and that monetary penalties will be

submitted to the Treasury Offset Program so that payments to Defendant may be applied to federal

debts.

15.    Defendant understands that restitution, forfeiture, and fines are separate components

of sentencing and are separate obligations. Defendant agrees to take all steps necessary to pass

clear title to forfeitable assets to the United States and to assist fully in the collection of restitution

and fines. Subject to the provisions of paragraph 4 above, Defendant waives the right to challenge

in any manner, including by direct appeal or in a collateral proceeding, any restitution order, any

forfeiture orders, and any fines. Defendant agrees that any fine, restitution, or monetary penalty

imposed by the Court will be due and payable immediately and that should the Court impose a

payment schedule, the payment schedule sets forth minimum payments and does not foreclose

additional collection of restitution

### Forfeiture

16.    As part of this plea agreement, Defendant agrees to the following:

(a) to forfeit, via either an administrative, civil, or criminal forfeiture proceeding, all assets
listed in the charging document (including any Supplemental Notice of Forfeiture), and to

forfeit or abandon any assets seized during this investigation or a related investigation including but not limited to the following specific assets: Approximately $5,885,000 in funds held in a financial account at Bank of America; Approximately 58 pallets of an assorted variety of A100, H100, and H200 Tensor Core GPU baseboard modules; and Approximately 32 H200 Tensor Core GPU baseboard modules;

(b) to withdraw (and/or agree to not submit) any claims and petitions for such listed or seized assets, whether in this proceeding or another proceeding, and to waive notice of administrative proceedings (including forfeiture, destruction, and abandonment for seized property);

(c) that the Court will determine the proper amount of a money judgment, if any;

(d) that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists, so that any forfeiture money judgment may be immediately satisfied via forfeiture of substitute property; and

(e) to the order of forfeiture becoming final as to Defendant immediately following this guilty plea or immediately following entry of the forfeiture order, whichever applies.

### Financial Statement

17.   Defendant agrees to truthfully complete under penalty of perjury, within thirty days of the execution of this Plea Agreement, a financial statement on a form provided by the United States Attorney's Office and to update the statement within seven days of any material change. Defendant also agrees to make full disclosure to the United States Probation Office of all current and anticipated assets in which Defendant has an interest both before sentencing and again before termination of supervised release or probation, with such disclosures to be shared with the United States Attorney's Office.

18.   Defendant further agrees not to dispose or transfer any assets without the prior written permission of the United States and to authorize the release of all financial information requested by the United States, including, but not limited to, credit histories and tax returns. Defendant agrees

21

to discuss and answer any questions by the United States relating to Defendant's financial disclosure, including in a deposition or informal debtor exam, whether before or after sentencing.

### Complete Agreement

23.   This written plea agreement, consisting of 24 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel. Other than any written proffer agreement(s) that may have been entered into between the United States and Defendant, this agreement supersedes any prior understandings, promises, agreements, or conditions between the United States and Defendant. No additional understandings, promises, agreements, or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

24.   Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _____Houston_____, Texas, on _____October 10_____, 2025.

_____

Alan Hao Hsu
Defendant

Subscribed and sworn to before me on _____October 10_____, 2025.

NATHAN KYLE OCHSNER
UNITED STATES DISTRICT CLERK

By: _____

Deputy United States District Clerk

22

APPROVED:

**NICHOLAS J. GANJEI**
United States Attorney

By: _____
John Marck
Assistant United States Attorney
Southern District of Texas
United States Attorney's Office

By: _____
S. Mark McIntyre
Assistant United States Attorney
Southern District of Texas
United States Attorney's Office

**JOHN A. EISENBERG**
Assistant Attorney General
National Security Division

By: _____
Fatema Merchant
Yifei Zheng
Trial Attorney
National Security Division
U.S. Department of Justice

_____
Jeffery Vaden
Attorney for Defendant

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 4:25-cr-00510 |
| | § | |
| ALAN HAO HSU, | § | |
| a.k.a. HAOCHUN HSU | § | FILED UNDER SEAL |
| | § | |

PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant his rights with respect to the pending Information. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory, and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. I have also explained to Defendant that sentences on multiple counts may be imposed to run consecutively to one another or to any other sentence. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.


_____          ___10/10/2025___
Jeffery Vaden                              Date
Attorney for Defendant


I have consulted with my attorneys and fully understand all my rights with respect to the Information pending against me. My attorneys have fully explained, and I understand, all my rights

24

with respect to the provisions of the United States Sentencing Commission's Guidelines Manual

which may apply in my case. I have read and carefully reviewed every part of this plea agreement

with my attorneys. I understand this agreement, and I voluntarily agree to its terms.

10/10/2025

_____        _____
Alan Hao Hsu                            Date
Defendant

25